UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ONITA TUGGLES, | Case No. C08-01914 JCS |
| Plaintiff(s), | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | **[Docket No. 79]** |
| CITY OF ANTIOCH, ET AL., | |
| Defendant(s). | |
| _____/ | |

## I.    INTRODUCTION

On July 17, 2009, Defendants City of Antioch, Antioch Police Department, James Hyde, Steve Bias, Mitchell Schwitters, Desmond Bittner, and William Dillard, II ("Defendants") filed a Motion for Summary Judgment, or in the alternative, for Summary Adjudication. Plaintiff opposes the motion, with the exception of claims seven and eight of the Second Amended Complaint ("SAC"). Plaintiff agrees that her seventh and eighth claims for relief under 42 U.S.C. § 1437d(q)(7) and 42 U.S.C. § 1437d(q)(2) should be dismissed. *See* Plaintiff's Opp. at n. 1, n. 19. The Court therefore GRANTS Defendants' Motion for Summary Adjudication with respect to claims seven and eight.

The parties have previously consented to the jurisdiction of this Court. The motion came on for hearing on September 8, 2009 at 9:30 a.m. For the reasons stated below, the Defendants' Motion for Summary Judgment/Adjudication ("the Motion") is GRANTED IN PART AND DENIED IN PART as follows:

1) the Motion as to claims one through four, to the extent based upon the unauthorized release of juvenile records, is GRANTED as to all Defendants;

2) the Motion on Plaintiff's equal protection claim under §1983 (claim 1) is GRANTED as to all Defendants with the exception of Officer Bittner. The motion is DENIED with respect to Officer Bittner;

3) the Motion is GRANTED on Plaintiff's procedural due process claims (claim 1) as to all Defendants;

4) the Motion is GRANTED on Plaintiffs §§ 1985(3) and 1986 claims (claims 3 and 4) as to all Defendants with the exception of Officer Bittner.  The motion is DENIED with respect to Defendant Bittner;

5) the Motion is GRANTED on Plaintiff's §3604 claim (claim 6) as to all Defendants;

6) the Motion is GRANTED on Plaintiff's §3617 claim (claim 6) as to all Defendants, except for Defendant Bittner.  The Motion is DENIED with respect to Officer Bittner;

7) the Motion is GRANTED on Plaintiff's claim under 42 U.S.C. § 2000d (Title VI of the Civil Rights Act of 1964) (claim 5) as to all Defendants;

8) the Motion is GRANTED on Plaintiff's *Monell* claim (claim 2) with respect to municipal liability for all Defendants;

9) the Motion is GRANTED as to all Defendants on Plaintiff's claim based upon the breach of mandatory duties (claim 10);

10) the Motion is GRANTED on Plaintiff's respondeat superior claim (claim 11) as to all Defendants except with respect to the claims against Defendant Bittner in claims 16 and 17;

11) the Motion is GRANTED on Plaintiff's negligence and IIED claims (claims 12 and 13) against all Defendants;

12) the Motion is GRANTED on Plaintiff's state abuse of process and malicious prosecution claims (claims 14 and 15) against all Defendants;

13) the Motion is GRANTED on Plaintiff's housing and race discrimination claims (claims 16 and 17) under state law as to all Defendants other than Officer Bittner.  The motion is DENIED with respect to Defendant Bittner;

14) the Motion is GRANTED on Plaintiff's declaratory and injunctive relief claim (claim 18) with respect to the claims that are dismissed herein, and DENIED with respect to the claims that may proceed to trial.

## II.     BACKGROUND

### A.     Factual Background

#### 1.  Plaintiff's Section 8 Tenancy

Plaintiff Onita Tuggles ("Plaintiff") and her two children, Natalia and Michael, are an African-American family, who lived at 1933 Paradise Peak Court in the City of Antioch from October 2003, through April 2007.  Joint Statement of Undisputed Facts #1, 2 (hereafter "JSUF").

Plaintiff was a recipient of rental assistance payments, under the Contra Costa County Housing Authority disbursed by the federally financed Housing Choice Voucher Program commonly known as "Section 8", codified in 42 U.S.C. § 1437f.  *Id.* #3.  Plaintiff's children, Natalia and Michael, were listed as authorized members of Plaintiff's household.  *Id.* #4.  According to the Housing Assistance Payments Contract and Plaintiffs Residential Lease-Rental Contract, there were a total of three authorized members in Plaintiff's  household.  *Id.* #5.  As a condition of receiving benefits, participants agree to abide by a list of  "Family Obligations," which states in pertinent part that, "members of the family may not engage in drug-related criminal activity, or violent criminal activity, or other criminal activity that threatens the health, safety or right to peaceful enjoyment of other residents and person residing in the immediate vicinity of the premises."  *Id.* #6.

#### 2.        Creation of the "Community Action Team" "CAT"

In July 2006, the Antioch Police Department established the Problem Housing Unit, also known as the Community Action Team (hereinafter "CAT").  *Id.* #7.  The creation of CAT was in response to the perception that much of the City of Antioch's problems could be attributed to the Section 8 population.  Candappa Decl., Exh. 2, Tamayo Depo. at 33:17-35:13.[1]  The creation of

---

[1]Defendants object to Exhibit 2 to the Candappa Declaration, which is testimony from the Deposition of Rudy Tamayo in the *Santeya Williams v. City of Antioch* case, C-08-2301 SBA. Defendants move to strike this testimony on relevance and hearsay grounds.  The relevance objection is overruled.  Defendants' hearsay objection is similarly misplaced. Sworn deposition testimony may be used by or against a party on summary judgment, even if that testimony was obtained in a separate proceeding.  *See Gulf USA v. Federal Ins. Co.*, 259 F.3d 1049, 1056 (9th Cir. 2001) citing *Curnow v. Ridgecrest Police*, 952 F.2d 321, 324 (9th Cir.1991).  The Ninth Circuit explained that "[s]uch testimony is considered to be an affidavit pursuant to Federal Rule of Civil Procedure 56(c), and may be used against a party on summary judgment as long as the proffered depositions were made on personal knowledge and set forth facts that were admissible in evidence."  *Id.* at 1056.  The deposition testimony cited here by Plaintiff satisfies this rule.  Defendants also object to Exhibit 8 entitled "Policing Low-Income African-American Families in Antioch" prepared by Public Advocates and Bay Area Legal Aid. Defendants object to this "evidence" and have moved to strike it from the record.  The Court GRANTS Defendants' motion to strike. The report is inadmissible hearsay.  Moreover, even if the Court were to

1   CAT occurred as foreclosures were increasing, and city homeowners and city council members

2   increasingly looked to Section 8 housing recipients as the culprit of the increased "crime and blight."

3   *Id.* The CAT team is responsible for handling all Section 8 housing cases and issues. Candappa

4   Decl., Exh. 10, Schwitters Depo. at 78:13-85:21.

5   Between July 2006 and July 2007, the CAT recorded a total of 120 arrests and citations, 51

6   (43%) of which were African-Americans and 37 (31%) were Caucasians. Candappa Decl., Exh. 10,

7   Schwitters Depo. Ex 17, Bates Nos. 005-006. According to documents produced in this case by

8   HACCC, 46% of the Section 8 tenants in Antioch are African-American and 49% of them are

9   Caucasian. Candappa Decl., Exh. 7, Housing Choice Vouchers in Antioch.

10  Defendant Officer Bittner was assigned to CAT from July 10, 2006, through March of 2008.

11  JSUF #8. Defendant Officer Dillard was assigned to CAT from July 10, 2006 through April of

12  2007. *Id.* #9. Defendant Sergeant Schwitters has been the supervisor of CAT since its inception in

13  July 2006. *Id.* #10. Defendant Corporal Bias was a supervisor assigned to CAT from July 2006 to

14  July 2007. *Id.* #11.

### 3.   The Investigation of Plaintiff and her Family

16  By letter dated March 14, 2007, Plaintiff's property manager, Select 1 Realty, sent Plaintiff a

17  letter stating that it "has come to our attention there may be people living at the property referenced

18  above (1933 Paradise Peak) that are not on your contract." *Id.* #12. In Select 1 Realty's letter of

19  March 14, 2007, Plaintiff was advised that "this is a violation of your rental agreement and possible

20  cause for termination." *Id.* #13.

21  According to Defendants, someone at Select 1 Realty had recognized Plaintiff's name from a

22  Contra Costa County Times newspaper article, dated March 9, 2007, entitled "Police, Teens

23  Involved in Brawl." Declaration of Noah Blechman, Exh. L. The article specifically referred to

24  Plaintiff's 16-year-old son, Michael Housley, who had been interviewed and was quoted in the

25  article. *Id.,* Exh. K. The article also quotes "Mr. Housley's mother, Onita." *Id.*

26  That same morning, Roberta Haynes, a Welfare Fraud Investigator for the County of Contra

27  Costa, contacted the Antioch Police Department Officer Dillard about the matter because the

28

consider this evidence, the Court's analysis and conclusion remain the same.

complaint was one that she could not investigate, due to the fact that Employment and Human Services (EHSD) did not have an "open case" on the matter. Blecher Decl., Exh. M. According to Officer Dillard, he asked Ms. Haynes to submit all complaints in writing to APD. *Id.*, Exh. E, Dillard Deposition, 67:16-68:8, 74:11-22.

Officer Dillard subsequently received a confirming e-mail from Ms. Haynes on March 15, 2007, at approximately 8:37 a.m., regarding the complaint. *Id.*, Exh. M, Exh. E, 64:20-67:7.[2] In that email, Ms. Haynes refers both to the newspaper article, and the fact that she received a complaint that there "has been an unidentified male in the home for some time" who "answers the telephone and greets repair men." *Id.* Ms. Haynes also expressed the concern that a complainant "wanted to know why Section 8 it [sic] paying rent for a 5 bedroom home for three people." *Id.*, Exh. M. Ms. Haynes explained further that she advised the complainant to report the matter to the Antioch Police Department and Section 8 Housing Manager, Joanna Rodriguez because "it was a housing issue." *Id.*

Also on March 15, 2007, Officer Dillard ran CLETS system checks on Onita Tuggles and her daughter, Natalia. JSUF #17. The CLETS checks were time stamped 8:10 and 8:11 in the morning. *Id.* Shortly thereafter, at approximately 8:16 a.m., Officer Dillard opened an event report relating to 1933 Paradise Peak Court. *Id.* #14. The event report, #07-021502, does not identify Plaintiff's son by name, but simply references a "bmj" (black male juvenile). *Id.* #15. Later that same day, at 1:51 p.m., Officer Dillard retrieved Antioch Police Department incident reports pertaining to the juveniles living at Plaintiff's address to be released to the Contra Costa Housing Authority (hereafter "HACCC"). *Id.* #18.

In a letter dated March 15, 2007, Officers Dillard and Bittner informed Ms. Rodriguez of the Housing Authority in writing that "two *authorized* juveniles," living at 1933 Paradise Peak Court, "have been involved in recent and multiple violent assaults" in the City of Antioch. *Id.* #19. Officer Dillard stated that "this brother and sister have been active participants in several fights and disturbances at the Regal Theater and Deer Valley Plaza" and mentioned several arrests of both juveniles. *Id.* #22. Officer Dillard stated that he believed that the incidents "constitute a violation of

---

[2]There is no evidentiary basis on which to accept Plaintiff's assertion that Officer Dillard was not sent or did not receive this email.

section 'U' of the Family Obligations Form." *Id.* #23. Officer Dillard requested HACCC to take "appropriate actions as deemed necessary." *Id.* The letter included an article from the Contra Costa Times newspaper regarding the "near riot" adding that the officers do not endorse the truth of the facts in the article, but wanted Ms. Rodriguez to be aware of it. Exhibit O.[3] The letter was reviewed by Sergeant Schwitters as evidenced by initials on the bottom right hand corner of the document. *Id.* #24.

Prior to receiving the March 15, 2007, letter from APD, Ms. Rodriguez had already been contacted by the Contra Costa County Welfare Fraud Investigator, Ms. Haynes. JSUF #27. Ms. Rodriguez had also received a complaint from the property manager alleging possible non-compliance by Plaintiff on the basis that there was a possible unauthorized member, a male, living in the unit. *Id.* # 28. Ms. Rodriguez recalls investigating the matter and was unable to substantiate the allegation pertaining to the unauthorized member. *Id.* #29. Ms. Rodriguez further received APD's incident reports pertaining to juveniles living at Plaintiff's address. *Id.* #26. She shredded the reports prior to the termination hearing. *Id.*

Also on March 15, Officers Bittner and Dillard went to Plaintiff's home. Tuggles Decl. ¶3. The officers entered her home after informing her that they wanted to discuss how they could improve relations between the Antioch Police Department and residents. Tuggles Decl. ¶3; Candappa Decl. Ex. 13, Bittner depo, at 124:13-125:19. The meeting ended "on a good note" and the officers left. Candappa Decl. Ex. 13, Bittner depo, at 127:19-25.

According to Plaintiff, upon leaving her residence, Plaintiff's son Michael told her that one of the CAT officers opened her mailbox that was located outside. Tuggles Decl. ¶7. Plaintiff feared that the officers may be reading or tampering with her mail and so she asked her son Michael to go outside and check the mailbox. *Id.* He returned with a letter from Select 1 Realty. Tuggles Decl. ¶8. Plaintiff believes that this letter was delivered by hand, due to the fact that her mail was delivered by the U.S. postal service later in the day, after Michael had retrieved the Select 1 Realty letter. *Id.* The Select 1 Realty letter from the property manager, Sandy Mello, was dated March 14, 2007, and

---

[3]There are two newspapers articles that are discussed by the parties. It is unclear which one was included in Officer Dillard's letter to Ms. Rodriguez, although from the description, it appears to be the March 8, 2007 article (Exh. P), which does not name the individuals involved in the "near riot." The March 9, 2007 letter explicitly refers to Onita and her son Michael Housley (Exh. K).

alleged that there may be people living with Plaintiff who were not on the rental contract.  Tuggles Decl. ¶9.

Plaintiff called Select 1 and spoke with Ms. Mello about the letter she had received and inquired about the allegation. Tuggles Decl. ¶ 10.  Ms. Mello informed her that she had received information from an anonymous source that there were people living with Plaintiff who were not authorized to live there. *Id.*  Plaintiff denied the allegation and invited Ms. Mello to send someone over to investigate the matter. *Id.*  After the conversation with Ms. Mello on March 15, Plaintiff did not hear from Ms. Mello concerning this allegation.  *Id.*

On March 19, 2007, at approximately 2:12 p.m., Officer Dillard memorialized the CAT visit to Ms. Tuggles in the relevant event report , No. 07-021502, as follows:  "After a lengthy talk with the mother of the two out of control juveniles from this unit, this case was submitted to Section 8 for termination."  Blechman Decl., Ex. J, Bates No. D3189.

On March 28, 2007, Defendant Sgt. Schwitters informed Eduardo Almodovar, the property owner of 1933 Paradise Peak Court, that "residents at the location have multiple arrests by APD ... for violent crimes and for disturbing the peace," and that he hoped to "work with" Mr. Almodovar to "gain immediate compliance regarding the listed issues and avoid criminal abatement and civil litigation."  JSUF #30.  Sgt. Schwitters further notified the property owner that he would not be considered an "innocent owner" in any future action if he did not take reasonable steps to prevent "any future unlawful use" of his property.  *Id.* #31.

On March 28, 2007, before the property owner or manager took any action, HACCC sent Plaintiff a 30-day notice advising her that HACCC was proposing to terminate her Section 8 housing benefits voucher because members of Plaintiffs household were involved in criminal activity in violation of CFR 24 Section 982.551(1) - crime by household members. *Id.* #32.  The termination letter further stated that Plaintiff s Housing Assistance Payment contract would terminate on April 27, 2007.  *Id.*  The HACCC letter of March 28, 2007, stated that Plaintiff could request a hearing in writing within 10 days of the letter.  *Id*. #33.

On March 28, 2007, Ms. Rodriguez from HACCC notified Plaintiff's property manager, Select 1 Realty, about the termination of Plaintiffs Section 8 Housing Assistance voucher effective April 28, 2007, for program non-compliance and/or breach of family obligations.  *Id.* #34.  Ms.

Rodriguez's letter further stated that Plaintiff would be responsible for the full amount of the rent beginning April 28, 2007, should she continue to stay in the unit past the termination date. *Id.* The letter also noted that the Housing Authority has a high success rate on terminations. *Id.*

On March 30, 2007, Plaintiff's property manager, Select 1 Realty, served Plaintiff with a 60-day tenancy termination notice. *Id.* #35. On March 30, 2007, the property owner, Mr. Almodovar, called Select 1 Realty because he was concerned about his liability after receiving Sgt. Schwitter's letter. *Id.* #36. Select 1 Realty told Mr. Almodovar that he had nothing to worry about. A 60-day cancellation notice had already been served. *Id.* #37

On April 5, 2007, Plaintiff requested a hearing in writing. *Id.* #38. Plaintiff's hearing was not set until after the date of the termination of her Section 8 Housing Choice Voucher. *Id.* #39. According to Housing Authority records, Plaintiff's termination hearing was initially scheduled for May 21, 2007. *Id.* Plaintiff and her family moved out of 1933 Paradise Peak Court on or about April 26, 2007. *Id.* #40.

On June 11, 2007, HACCC conducted an administrative hearing to determine whether Plaintiff's benefits under Section 8 Housing Choice Voucher Program were lawfully terminated by HACCC. *Id.* #41. Ms Rodriguez requested Officer Bittner's presence at the hearing and further requested that the Antioch Police Department officers bring the following enumerated police reports to the hearing: 05-008068, 05-007019,04-010923, and 07-002458. *Id.* #42. Officer Bittner testified at the June 11, 2007, hearing. *Id.* #43. He stated that an investigation showed that there were several incidents involving authorized members of Plaintiff's household. *Id.* Officer Bittner further testified that he was not the arresting officer and was not present at the scene of any of the incidents. *Id.* Officer Bittner would not disclose any facts at the hearing about the disposition of these incidents because they involved juveniles. *Id.* Officer Bittner was also questioned about a March 2007 Contra Costa Times newspaper article, but he would not confirm or deny the factual accuracy of the report. *Id.* #44. Officer Bittner did not produce any police reports pertaining to Plaintiff's children at that hearing. *Id.* #45.

On June 26, 2007, the HACCC rescinded the HACCC Notice of Decision and termination of Plaintiffs Section 8 benefits because HACCC's termination notice did not meet due process requirements. *Id.* #46. According to the Hearing Officer, the notice of HACCC Notice of

Decision, and termination did not contain a "factual statement of the incident or incidents that the Housing Authority considered a violation of the family obligations and cause for terminating assistance." *Id*. #47. Further, the notice did "not indicate which family members committed the proscribed acts, what the nature of the alleged crime or crimes was, or when the relevant acts were committed." *Id.* The HACCC reinstated Plaintiffs Section 8 benefits in August 2007. *Id.* #48.

### B. Procedural History

On April 10, 2008, Plaintiff filed a complaint in federal court, which was amended on April 30, 2008, and on March 6, 2009. On April 10, 2009, pursuant to a settlement agreement, Defendants Housing Authority of the County of Contra Costa, Elizabeth Campbell, Kathy Guzman and Joanna Rodriguez were dismissed with prejudice from this action. The remaining Defendants, City of Antioch, Antioch Police Department and the individual APD Defendants filed the present motion for summary judgment.

## III. DISCUSSION

### A. Legal Standard on Motion for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Further, "*Celotex* requires that for issues on which the movant would bear the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact," that is, "that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir.1993). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Id*. at 323. On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 255 (1986).

A district court need not scour the record in search of a genuine issue of triable fact. *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir.1996). The nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. *Id.* If the nonmoving party fails to do so, the district court may grant summary judgment in favor of the moving party. *See Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1028-29 (9th Cir.2001) (even if there is evidence in the court file that creates a genuine issue of material fact, district court may grant summary judgment if the opposing papers do not include or conveniently refer to that evidence). Although the district court has discretion to consider materials in the court file not referenced in the opposing papers, it is not required to do so. *Id.* at 1029. "The district court need not examine the entire file for evidence establishing a genuine issue of fact." *Id.* at 1031.

**B.      Standing**

Plaintiff claims that Defendants: 1) initiated and pursued an investigation against her; 2) disclosed her children's juvenile records to the HACCC; and 3) wrote a threatening letter to her property owner, all in violation of federal law. As a threshold matter, Defendants argue that Plaintiff lacks standing to pursue her first through fourth claims under 42 U.S.C. §§1983, 1985 and 1986 on behalf of her minor children, Michael and Natalia, based upon the unlawful release of confidential juvenile records.

The Court finds that Plaintiff has made no showing that she has suffered a violation of her own constitutional rights, sufficient to give rise to a claim under 42 U.S.C. §1983 based upon the disclosure of her children's juvenile records. Indeed, Plaintiff does not address Defendants' standing argument at all. Plaintiff does not identify the interest she allegedly possesses in her children's juvenile court records. For example, in certain cases, a parent may assert §1983 claims for damages against defendants whose conduct constitutes governmental interference with the parental relationship. *See e.g., Morrison v. Jones,* 607 F.2d 1269, 1275 (9th Cir. 1979) (contention that mother has no standing to sue because merely asserting rights of her child is frivolous; defendants' actions caused injury to her relationship with her son, which is protected by the Constitution). Here, Plaintiff has not argued that her interest in the confidential juvenile records rises to the level of a protected interest. Plaintiff has not brought this lawsuit as guardian on behalf of her minor children; rather, she has filed the action on her own behalf. She lacks standing to

pursue any Fourth Amendment violations on behalf of her children because a person cannot claim a derivative constitutional violation on the basis of the intrusion of another's property or privacy rights. *See e.g.*, *Wilkinson v. F.B.I.,* 99 F.R.D. 148, 150 (C.D. Cal. 1983).

Plaintiff has identified no independent *federal* basis on which to claim a violation of her own constitutional rights related to the juvenile records. Accordingly, the Court GRANTS Defendants' motion for summary adjudication with respect to all claims of the Second Amended Complaint that are based upon the unlawful disclosure of juvenile records.

Even if the Plaintiff had standing to pursue a federal claim with respect to the unauthorized release of juvenile records and failure to disclose them to her, the Court concludes that the Defendants are shielded from liability by qualified immunity.

**C.      Defendants are Protected from Liability for Release and Failure to Disclose Juvenile Records by Qualified Immunity[4]**

The individual Defendants argue that even assuming a constitutional violation related to the release of juvenile records and failure to disclose them to Plaintiff occurred, they are entitled to qualified immunity and cannot be held responsible for their conduct under *Saucier v. Katz*, 533 U.S. 194 (2001). The Court agrees.

**1.      Standard Governing Qualified Immunity**

Under the doctrine of qualified immunity, even if a constitutional violation occurred, governmental officials are immune if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether a defendant is entitled to qualified immunity, courts must first ask, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 200 (2001). If not, the qualified immunity analysis ends here. *Id.* at 201. On the other hand, "if a

---

[4]The Court does not address in this section the claim that the release of the records, if true, was based upon racial discrimination against Plaintiff. That assertion is discussed below.

1    violation could be made out on a favorable view of the parties' submissions, the next sequential step

2    is to ask whether the right was clearly established." *Id.*[5]

3          The inquiry as to this second question must be "particularized." *Id.* It is not enough that the

4    general rule is established. *Id.* Rather, "[t]he relevant dispositive inquiry in determining whether a

5    right is clearly established is whether it would be clear to a reasonable officer that his conduct was

6    unlawful *in the situation he confronted*." *Id.* at 202 (emphasis added). The Supreme Court has

7    cautioned that courts should afford "deference to the judgment of reasonable officers on the scene"

8    and should not use "20/20 hindsight vision." *Id.* at 205. Thus, "[e]ven law enforcement officials

9    who 'reasonably but mistakenly conclude that probable cause is present are entitled to immunity.'"

10   *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (citing *Mitchell v. Forsyth*, 472 U.S. 511 (1985)).

11                    **2.     Applicability of Qualified Immunity to the Facts of this Case**

12         As discussed above, the Court finds no constitutional violation of Plaintiff's rights pertaining

13   to the release and failure to disclose juvenile records on the undisputed facts of this case. The

14   qualified immunity analysis, therefore, ends there at the first step in the analysis discussed above.

15   Even if Plaintiff had presented sufficient evidence of a constitutional violation, however, the Court

16   would find that the Defendants are entitled to qualified immunity.

17         The second question for the Court to address in the qualified immunity analysis is whether

18   the right was clearly established at the time the Defendants acted. *Saucier,* 533 U.S. at 201. If the

19   answer to that question is yes, then the Court must analyze whether the Defendants could have

20   reasonably believed that their conduct did not violate a clearly established constitutional right. *Id.*

21         The Court concludes that the law with respect to whether Defendants were permitted to

22   release juvenile records to a welfare agency, here HACCC, conducting proceedings investigating

23   potential violations of law was not clearly established at the time of the incident in this case.

24         The California Welfare and Institutions Code §827 provides general provisions regarding the

25   release of juvenile files, but does not provide guidance regarding the specific issues here – release of

26   records to the Housing Authority. There are no specific laws or regulations that address this issue.

27

28
_____

        [5]Although the Court in *Saucier* established these two steps in a strict sequential order, a
subsequent decision of the Supreme Court, *Pearson v. Callahan*, – U.S. – , 129 S.Ct. 808, 818 (2009),
held that lower courts have discretion to decide which of the two prongs to consider first. The sequence
is no longer mandatory. *Id.*

Defendants also point out that other local counties, San Francisco and Santa Clara, for example, allow dissemination of juvenile police records and information to the housing authority. *See* Defendant's Motion at 17. Because the law with respect to whether the police officers could lawfully provide the Housing Authority with juvenile police records for use at the hearing was uncertain at the time of this incident, the individual Defendants were not on notice that the release of juvenile information to the Housing Authority in preparation for a hearing on potential housing violations was unlawful.[6] The Defendants are entitled to qualified immunity on Plaintiff's claims one through four based on the unauthorized release of juvenile records.[7]

**C.      Plaintiff's First through Sixth Claims for Relief – Discrimination Based on Race**

Plaintiff asserts that she was discriminated against on the basis of race in her first through sixth claims for relief under 42 U.S.C. § 1983, § 1985(3), § 1986 § 2000d and § 3617. Plaintiff claims that she was deprived, under §1983, of due process and equal protection. Section 1983 provides that:

> Every person who, under the color of any statute . . . subjects . . . any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and law, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. 1983. "Section 1983 is not itself a source of substantive rights but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994). To state a claim pursuant to section 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution and laws of the United States was violated; and (2) that the alleged violation was committed by a person acting under the color of the law. *West v. Atkins*, 487 U.S. 42, 48 (1988). As defined by the courts, a person "subjects" another to the deprivation of a constitutional right under §1983 if he or she commits an affirmative act, or omits to perform an act that he or she is legally required to perform that causes the constitutional deprivation. *Johnson v.*

---

[6]Indeed, Officer Bittner testified at his deposition that to his knowledge this was a "gray area" of the law and that he believed it was permissible to release redacted juvenile records to the Housing Authority. *See* Exh. F, Bittner Depo., 194:11, 196:7-16.

[7]For the same reasons, the Court finds that the individual Defendants are shielded from liability by qualified immunity for the officers' failure to disclose the records to Plaintiff at the hearing.

13

*Duffy*, 588 F.23d 740, 743 (9ᵗʰ Cir. 1973).  In addition, Plaintiff claims that Defendants' conduct violates §§1985, 1986, 2000d and 3617.

In support of her race discrimination claims, Plaintiff argues, based upon a "concerted action" theory, that the Antioch Police Department acted in concert with the Housing Authority in order to terminate her housing benefits unlawfully.  Plaintiff first argues that the Antioch Police Officers unlawfully discriminated against her by opening an investigation into her Section 8 housing benefits based upon her race.  Plaintiff argues that the CAT officers' conduct in this case is consistent with a pattern of racial profiling of Section 8 tenants in the City of Antioch in violation of the Equal Protection Clause.  Plaintiff also argues that the officers unduly influenced the property owner, Mr. Almodovar, and Select 1 Realty in an effort to have her evicted from her home.  Plaintiff argues that a conspiracy between HACCC and CAT existed, the purpose of which was to deprive Plaintiff of her constitutional rights.  Plaintiff also argues that she was deprived of procedural due process when her Section 8 voucher was terminated without a hearing.

Defendants argue that there are no material facts in dispute that could support Plaintiff's allegations that she was targeted for investigation based upon her race, and that the Antioch Police Department influenced Plaintiff's landlord, Select 1 Realty, to evict her.  Defendants claim that Plaintiff was investigated solely because of the complaint against her, referred to CAT from the welfare officer, Ms. Haynes, and based upon the arrests of Plaintiff's teenaged children, and that there are no facts that support Plaintiff's claim of racial profiling or the disparate treatment of African-American Section 8 tenants.  Defendants argue that Plaintiff's "equal protection and due process claims fail alike."  Def.'s Mtn. at 11.

As to the allegations of race-based animus to support her Equal Protection claim under 42 U.S.C. §1983, the Court finds that there are material facts in dispute that prevent the Court from concluding as a matter of law that Plaintiff was not targeted for removal from Antioch's Section 8 housing program based upon her race by Officer Bittner.  Plaintiff has provided no such evidence as to the remaining individual and City Defendants that could support a claim of race-based discrimination.   In addition, Plaintiff's procedural due process claim fails as a matter of law against all Defendants.

The Court will address each of Plaintiff's theories of federal liability in turn.

### 1.    Equal Protection (Claim 1)

The Equal Protection Clause provides that no state shall "deny any person within its jurisdiction the equal protection of the law." U.S. Const. Amendment XIV, § 1. The Equal Protection Clause "is basically a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). Where disparate treatment of a group is shown, the level of scrutiny to which the state's action is subjected depends upon the type of group classification at issue. *Id.* at 439-443.

A long line of Supreme Court cases make clear that the Equal Protection Clause requires proof of discriminatory intent. *See e.g.*, *Washington v. Davis*, 426 U.S. 229 (1976); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). These cases establish that Plaintiff must prove two elements before she may be entitled to relief under the Fourteenth Amendment : 1) discriminatory effect; and 2) discriminatory purpose. In *Arlington Heights* and *Davis*, a challenge based on "discriminatory effect" failed due to plaintiffs' inability to establish the existence of a discriminatory purpose. In *Arlington Heights*, the Court found no evidence that the city intended to discriminate against racial minorities by refusing to re-zone property from single-family to multiple-family units, even though most minorities can only afford multiple-family units. The Court explained in *Davis, supra*, that "disproportionate impact is not irrelevant, but is not the sole touchstone of an invidious racial discrimination. . ." 426 U.S. at 242.

Plaintiff argues that the CAT officers' conduct has a disproportionate impact upon African-Americans generally. Where a plaintiff seeks to prove the invidious discriminatory intent element of a violation of the Equal Protection Clause through disparate impact and " . . . the challenged governmental policy is 'facially' neutral,' proof of its disproportionate impact on an identifiable group can satisfy the intent requirement only if it tends to show that some invidious or discriminatory purpose underlies the policy." *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001) (citing *Arlington Heights* at 264-66) (*citing Washington v. Davis*, *supra*, at 242). "[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Washington v. Davis*, 426 U.S. at 242. The Supreme Court explained in *Davis* that ". . . our cases have not embraced the proposition that a law or other official act, without regard to whether it

1    reflects a racially discriminatory purpose, is unconstitutional solely because it has a racially

2    disproportionate impact." *Id.* at 239.

3        One of the earliest Equal Protection cases establishes that "the effect of a law may be so

4    harsh or adverse in its weight against a particular race that an intent to discriminate is not only a

5    permissible inference but also a necessary one." *Id.* (citing *Yick Wo v. Hopkins*, 118 U.S. 356

6    (1886)). Indeed, there are cases where "a clear pattern unexplainable on grounds other than race,

7    emerges from the effect of the state action." *Id.* (citing *Arlington Heights*, 429 U.S. at 266). The

8    law is clear, however, that "such cases are rare. Absent a pattern as stark as that in . . . *Yick Wo*,

9    impact alone is not determinative, and the Court must look to other evidence." *Arlington Heights* at

10   266.

11           *a.     Evidence of Disparate Impact*

12       The Court concludes that the evidence produced by Plaintiff of discriminatory impact in this

13   case is insufficient, by itself, to raise an inference of discriminatory intent. Much of the proffered

14   evidence is hearsay. That which is not hearsay is too weak to show discriminatory intent by itself.

15   At oral argument on Defendants' motion, counsel for Plaintiff agreed that in order for the equal

16   protection claim to survive summary judgment, Plaintiff must have some evidence from which an

17   inference of discriminatory intent could be drawn. Counsel also conceded that disparate impact

18   evidence, standing alone, is insufficient on the facts of this case.

19       In support of her claim of disparate impact on the African-American Section 8 community,

20   Plaintiff argues that the Community Action Team or "CAT" comprised of Antioch police officers,

21   unfairly targets African-American residents for investigation for Section 8 housing agreement

22   violations. As evidence of her claim, Plaintiff cites to evidence of investigations of Section 8 tenants

23   and argues that these investigations have a disproportionate impact upon African-Americans.

24   Plaintiff's Opp. at 6, citing Candappa Decl., Exh. 23, Schwitters Depo at 229:11-230:17, *Williams*

25   case. Specifically, Plaintiff points to evidence that between July 2006 and December of 2007, CAT

26   investigated 256 cases, 55% of which were Section 8 housing properties. *Id.* Plaintiff notes that

27   although 4% of Antioch families participate in Section 8 housing, 63% to 67% of the residential

28   cases investigated by CAT involved Section 8 properties. Candappa Decl., Exh 10, Schwitters

     Depo, Ex 8, Bates No. D106; Exh 22, CAT Event Reports. The Court finds this evidence of

disparate impact unconvincing. On its face, this evidence is racially neutral – that is, it demonstrates that Section 8 properties are targeted, not that African-American residents are targeted specifically. Plaintiff must show more to raise an inference of intentional discrimination.

Plaintiff next argues that although the Caucasian population is approximately three times the size of the African-American population in the City of Antioch, African-Americans are the subject of more CAT investigations than Caucasians. Based on a sample of 167 residential CAT Event Reports, for example, African-Americans were the subject of 67 CAT cases and Caucasians were the subject of 59 cases. Candappa Decl., Exh. 8 at 17. As stated above, the Court finds Plaintiff's cited "evidence" to be impermissible hearsay. *See, supra*, n. 1. The Court must consider only admissible evidence when considering a motion for summary judgment. Exhibit 8 to the Candappa Declaration is a report entitled "Policing Low-Income African-American Families in Antioch" prepared by Public Advocates and Bay Area Legal Aid. Even if this Court were to consider this evidence, it does not demonstrate a "significantly greater impact on African-Americans" sufficient to justify a finding of discriminatory intent. This evidence is, at best, weak evidence of a disproportionate impact. In the brief time period studied, event reports for African-American families outnumbered those for Caucasians 51 to 37. According to documents produced in this case by HACCC, (and cited by Plaintiff here) 46% of the Section 8 tenants in Antioch are African-American and 49% of them are Caucasian. Candappa Decl., Exh. 7, Housing Choice Vouchers in Antioch.

In addition to the above statistical evidence, Plaintiff claims that the CAT officers routinely approached neighbors of Section 8 recipients and asked them if they wanted to register complaints against their neighbors. Candappa Decl., Exh. 2, 167:2-6. As part of its investigations, Plaintiff also argues that CAT also conducts illegal searches of residences that were being investigated for possible Section 8 violations. *Id.* at 167-169. Recipients of Section 8 vouchers are not automatically subject to warrantless home searches; rather, any inspections related to potential housing violations conducted by the Housing Authority are "coordinate[d] with the tenant and sometimes the landlord may have to be there, but generally we give them 24 hours notice and we like to give 'em a lot of notice than that usually a week in advance to conduct our housing quality standards inspection." *Id.* at 169:11-25. Plaintiff also argues that CAT routinely mailed threatening letters to landlords of Section 8 residents, threatening civil and criminal action for failure to remedy

1  alleged nuisance and other conduct by Section 8 tenants, as was done in this case. Candappa Decl.,

2  Ex. 2, Tamayo Depo at 59:14-63:23, Exh. 10, Schwitters Depo., Ex. 24. These letters were co-

3  signed by Sergeant Schwitters, and the CAT supervisor, Chief Hyde. Candappa Decl., Ex. 10,

4  Schwitters Depo at 166:17-167, Schwitters Depo Ex. 24. Again, the Court finds that this evidence

5  supports the inference that *all* Section 8 tenants in Antioch were targeted for investigation

6  irrespective of race.

7         Plaintiff also argues that CAT works closely with the HACCC to terminate the Section 8

8  vouchers of households that violate the rules of the Section 8 program. Candappa Decl., Exh. 2,

9  Tamayo Depo at 92:19-94, 166:18-7. From May 2007 until approximately November 2008,

10  HACCC was receiving 5-7 "admonishment letters" per week. This frequency of contact between

11  APD and HACCC under Ms. Rodriguez's tenure is proffered by Plaintiff as further proof of

12  discriminatory intent on behalf of APD. The current manager at HACCC, Zanetta McNab, testified

13  at her deposition that since 2008, the number of letters received from APD has diminished to maybe

14  two or three per month. Candappa Decl., Exh. 3, 72:6-25-73:15-25. Since the departure of the

15  previous manager, Ms. Rodriguez, the rules changed at HACCC, and in order for HACCC to release

16  information about Section 8 recipients to APD, the officers had to have an open case, or

17  investigation on which they were working. *Id.* This was a departure from the manner in which

18  HACCC and APD had previously worked. Ms. McNab testified that her supervisors had received

19  complaints from APD, complaining that she did not "work[] with them like the previous manager

20  [Joanna Rodriguez] did." *Id.* Exh. 3, McNab Depo., 3-21.

21         The Court is unpersuaded by this evidence. The close relationship between CAT and

22  HACCC says nothing about the race of the tenants at issue. Plaintiff's lengthy discussion and

23  citation to the record regarding the close relationship between the Defendants and HACCC does not

24  contain any facts that could support the inference that these investigations are conducted on the basis

25  of race.

26         Finally, Plaintiff cites the percentage of CAT complaints to HACCC. This fact provides

27  some, albeit weak, evidence of disparate impact. In 2006 and 2007, of the approximately 115

28  complaints received by the HACCC concerning Section 8 voucher holders in Antioch, 76 were

submitted by the Antioch Police Department. Candappa Decl. Ex. 24, HACCC spreadsheet

1   tabulating complaints for 2006 and 2007.  Although African-American households constitute 46% of

2   Section 8 Program renters in the City of Antioch, approximately 70% of the complaints by the CAT

3   to the HACCC concerned African-American tenants.  Candappa Decl. Ex. 25, HACCC Summary of

4   CAT Complaints about Section 8 Tenants, Bates No. 800.  The Court concludes that this evidence

5   provides some evidence of a facially neutral policy having a disparate impact on the African-

6   American community.  However, none of this statistical evidence demonstrates what the particular

7   Defendant officers in this case did – it refers to the conduct of the entire CAT, without any evidence

8   establishing whether CAT includes officers not named as Defendants in this lawsuit.  Standing

9   alone, this naked statistical evidence would not be sufficient to sustain a finding of intentional race

10  discrimination.  The Court therefore turns to other evidence of discriminatory intent.

11              *b.      Evidence of Discriminatory Intent*

12              Plaintiff does more here than simply claim discriminatory impact.  She cites to evidence of

13  specific instances of alleged racist conduct in support of her claim.  The Court will address

14  Plaintiff's proffered evidence as it pertains to each Defendant.

15              In support of her claim of racial profiling, or differential treatment of African-American

16  Section 8 recipients, Plaintiff points to the unlawful arrest of her son, Michael, and Officer

17  Bloxsom's alleged racist comments to her at the time of her son's arrest during the so-called "Gas

18  City" incident.[8]  *See* Plaintiff's Opp. at 8.  Plaintiff argues that the arrest of her son Michael

19  involved racial profiling and physical abuse on the part of the officers, none of whom are Defendants

20  here.  As "evidence" to support this argument, Plaintiff cites to an unverified complaint.  *See* Pl.'s

21  Opp. at 8, citing, Candappa Decl. Exh. 26 (First Amended Complaint, *DeArmand E. et al. v. City of*

22  *Antioch*, C-08-1709 SI ¶¶ 29-36).  The Court cannot consider allegations in an unverified complaint

23  as evidence on summary judgment.  In addition, none of this evidence refers to officers named as

24  Defendants in this case, except as noted below.  Discriminatory conduct by others does not support a

25  _____

26              [8]Defendants move to strike this evidence, arguing that this incident, the so-called "Gas City" incident" is the subject of another, separately-filed lawsuit pending before another judge of this Court

27  – Honorable Susan Illston.  *See DeArmand E. et. al. v. City of Antioch*, C-08-1709 SI.  Defendants argue that Judge Illston's order declining to find that the action arising out of the Gas City incident and the present case are "related" within the meaning of Civil Local Rule 3-12 is proof that the Gas City

28  incident is "unrelated and has no bearing on this case."  Def.'s Reply at 10, citing, *DeArmand E., et al. v. City of Antioch*, C-08-1709 SI, Docket No. 42 ("Order Denying Administrative Motion to Relate Cases.")  The Court disagrees.  The standard under Local Rule 3-12 is not at issue and has no bearing on the evidentiary standards the Court must follow in this case.

1    claim that these officers discriminated against Plaintiff.  Therefore, the Court rejects Plaintiff's

2    arguments related to the arrest of Plaintiff's son and does not consider them as evidence of

3    discriminatory intent by these Defendants.

4          Plaintiff also cites her own treatment at the hands of other Antioch police officers (again, not

5    named as Defendants here) that was overtly racist during the arrest of her son Michael as evidence

6    of APD's discriminatory intent.  Specifically, Plaintiff testified at her deposition that when she

7    arrived at the Gas City after the arrest of her son, Officer Bloxsom confronted her and said:

8          Get the fuck out of here. Get your black ass our of here because you not coming to Antioch
           with this shit. . . Get your black ass our of here because you black mother fuckers not coming
9          to Antioch with this shit.  Get the fuck out of here.[9]

10   Candappa Decl., Ex. 27, Onita Tuggles Deposition at 21-26:16,32:1-23, 35:4-36, DeArmand E.

11   Case.)  Plaintiff argues that Officer Bloxsom's treatment of her is relevant to this case in that

12   approximately one week after this incident, the CAT team began investigating her family and

13   submitted her case to the HACCC for termination of her Section 8 housing benefits on the grounds

14   that her children had committed crimes.  The Court disagrees.  This evidence involves an officer

15   who is not named as a Defendant in this action, nor is there any evidence that he had any

16   involvement in the conduct forming the basis of this lawsuit – Plaintiff's claim that APD was

17   directly involved in targeting Plaintiff for removal from Section 8 housing based upon her race.

18   Although there is undisputed evidence that Defendant Sergeant Schwitters was Officer Bloxsom's

19   supervisor at the time, there is no evidence in the record from which a jury could conclude that

20   Sergeant Schwitters endorsed Officer Bloxsom's comment, was present at the time of the incident,

21   or even knew about the allegedly racist comments.  There is no evidence from which a reasonable

22   juror could conclude that *any* of the individual Defendants were aware of the racist comments made

23   by Officer Bloxsom.

24         Finally, Plaintiff cites to another specific instance of allegedly racist conduct by Defendant

25   Officer Bittner.  She provides deposition testimony from another case pending in district court,

26   *Williams v. City of Antioch*, C 08-2301 SBA. There, a named plaintiff, Mary Ruth Scott, an African-

27   American woman, testified that the CAT officers forcibly entered her home searched her home and

28

---

      [9]Defendants object to this testimony and move to strike the evidence on the grounds that it is
hearsay under FRE 801, and that it is irrelevant due to the fact that Judge Illston declined to relate the
two actions.  The Court overrules both objections.

personal effects, refused to show her their warrant, told her to shut up and sit down and wait until she was spoken to. Candappa Decl., Exh. 34, Mary Scott Depo at 120:23-25, 128:11-129:24, 139:4-11, 144:12-25, 154-155, 197 12-23. During that incident, the plaintiff, Ms. Scott, alleges that Officer Bittner told her "you people are always causing something in this neighborhood" (*id.*, at 197:18-19) and "[y]ou people know how you people act. . . You guys are always causing problems over here." *Id.* at 199:23-200:1-25.

Defendants argue that this incident is irrelevant to this case because the particular conduct in the *Williams* case – an alleged illegal search – is not sufficiently similar to the conduct by CAT alleged in this case. The Court is not persuaded by this argument. The CAT officers' conduct need not be identical in each alleged incident in order to be probative of discriminatory intent. As long as a reasonable juror could conclude that the Officer Bittner discriminated against Section 8 housing residents on account of their status as African-Americans, then the evidence can be used to show discriminatory intent here.

Drawing all reasonable inferences in Plaintiff's favor, the Court finds that a reasonable jury could conclude that this statement of Defendant Officer Bittner – "you people" – was a racial epithet, and not just a statement directed toward people, regardless of race or other suspect classification, living in Section 8 housing in Antioch.

The Court finds that this incident of allegedly racist conduct, along with the evidence of disparate impact, could support an allegation of discriminatory intent on the part of Defendant Officer Bittner. The Court finds no evidence, however, that could support an inference of discriminatory intent on the part of the remaining Defendants.

    *c.    Causation*

Because the Court has concluded that there is some evidence that could support an inference of disparate impact and has found some disputed evidence of discriminatory intent on the part of Officer Bittner, the Court next addresses the parties' arguments with respect to causation. *See Johnson v. Duffy*, 588 F.2d 740 (9th Cir. 1978). Plaintiff argues that there is sufficient evidence to support her first through sixth claims for relief based upon a "concerted action" theory of liability. Citing *Johnson v. Duffy*, Plaintiff argues that Defendants, by opening an investigation and turning

information and police reports over to HACCC[10] set in motion a series of events, which the officers should have known would result in the violation of her constitutional rights. Defendants argue that Plaintiff seeks to impose liability against Defendants based on alleged constitutional violations committed by HACCC. Defendants argue that *Johnson v. Duffy* is "inapplicable" due to the fact that there is no "wrongful act" on the part of Defendants that set in motion a series of acts by others that Defendants "kn[ew] or reasonably should know[n] would cause others to inflict the constitutional injury." Defendants' Reply at 6, citing *Harris v. Roderick,* 126 F.3d 1189 (9th Cir. 1997).

As stated previously, the Court agrees with Defendants that there is no evidence of discriminatory intent with respect to the Defendants other than Officer Bittner. The Court disagrees, however, with Defendants regarding Office Bittner. The Court therefore turns to the evidence of Officer Bittner's conduct in order to determine whether Plaintiff has met her burden of presenting facts that could provide a basis for holding Officer Bittner liable for equal protection violations in connection with the termination of Plaintiff's Section 8 housing voucher by HACCC.

The evidence is sufficient to support an inference that Officer Bittner was involved in the investigation of Plaintiff by submitting the letter that was sent to Joanna Rodriguez of HACCC on March 15, 2007. Although this act is arguably facially neutral, the Court must draw all reasonable inferences in Plaintiff's favor. Coupled with the specific evidence of alleged racially discriminatory conduct above, a reasonable juror could find that Officer Bittner's letter to HACCC was motivated by racial animus and was, at least in part, the cause of the violation of her constitutional rights. Under *Johnson v. Duffy*, "[t]he requisite causal connection can be established not only be some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by other which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Id.* at 743-44.

Accordingly, the Court finds that there are disputed issues of fact that preclude summary adjudication on Plaintiff's Equal Protection §1983 claim against the Officer Bittner. There is no such evidence of discriminatory intent involving the remaining defendants, James Hyde, Corporal

---

[10]At oral argument, Plaintiff clarified that none of her claims is based upon the individual officer Defendants' testimony at her administrative hearing.

Steve Bias, Sergeant Mitchell Schwitters and Officer Dillard from which a jury could find discriminatory intent. Defendants' motion for summary adjudication with respect to the Equal Protection claim against these defendants is GRANTED. Defendant Officer Desmond Bittner's motion, however, is DENIED.

### 2. Procedural Due Process (Claim 1)

Plaintiff argues that her procedural due process rights were violated by the Antioch defendants based on their "collaboration with the HACCC" which deprived Plaintiff of due process by "play[ing] a key role in ultimately denying Ms. Tuggles her right to a fair hearing." Plaintiff's Opp. at 18. Plaintiff argues that her due process rights were violated when: 1) her hearing was too late, *i.e.*, it was held after she had been evicted from her home; 2) the Defendants produced confidential juvenile records to HACCC for use at that hearing in violation of the law; and 3) her rights at the hearing were violated when the Defendants refused to disclose the details of those records to her so that she could adequately defend against the allegations against her. Plaintiff argues at length that APD "violated numerous provisions of law for the express purpose of compromising Ms. Tuggles' right to a fair hearing." *Id.* The Court will address each of Plaintiff's procedural due process arguments in turn.

With respect to Plaintiff's first argument, the Court concludes that there is no evidence in the record before the Court from which a jury could conclude that the particular Defendants named here, Officers Hyde, Bias, Schwitters, Dillard and Bittner, had any involvement whatsoever in the timing of Plaintiff's hearing. HACCC was responsible for the timing of its own hearing, and Plaintiff has presented no evidence to the contrary. Defendants' motion for summary adjudication with respect to procedural due process violations stemming from the timing of the hearing is therefore GRANTED as to all Defendants.

Regarding the release of confidential juvenile records, and the testimony regarding those records, the Court finds that this aspect of Plaintiff's procedural due process claim is moot. Plaintiff was given a hearing and as a result of the finding that her due process rights were violated, her Section 8 benefits were reinstated.

Moreover, to the extent that Plaintiff bases her due process claim on violations of law as set forth in her seventh and eighth causes of action (violations of 42 U.S.C. §§ 1437d(q) based upon the

23

improper disclosure of juvenile records to HACCC and the refusal to release them to Plaintiff), Plaintiff has voluntarily agreed to dismiss those claims. They therefore do not form the basis of a due process violation against the remaining Defendants in this case. *See* Plaintiff's Br. at n. 1, n. 19.

The Court also finds that the officers are immune from liability on the issue of the Defendants' conduct in providing the juvenile records to HACCC for use at the hearing and with respect to the Defendants' testimony at the hearing. *See, supra,* at 11-12 (qualified immunity for release of juvenile records). Moreover, Defendants moved for summary adjudication on this ground, and Plaintiff did not oppose Defendants' motion with respect to qualified immunity.

Summary adjudication is therefore GRANTED as to Plaintiff's procedural due process claims against all Defendants.

> **3.** **Conspiracy to Violate Civil Rights under 42 U.S.C. § 1985(3) and Failure to Prevent Violations of Civil Rights under 42 U.S.C. § 1986 (Claims 3 and 4)**

42 U.S.C. § 1985(3) prohibits conspiracies that violate a person's civil rights. In addition, anyone who knows about imminent violations of section 1985 and can prevent or assist in the prevention of such wrongs through the exercise of reasonable diligence and fails to do so, may be liable to the injured person. 42 U.S.C. §1986. A claim under §1986 can only be stated if there is a valid complaint under §1985. *McCalden v. Cal. Library Ass'n*., 955 F.2d 1214, 1223 (9th Cir. 1992).

Plaintiff cites *United Steelworkers of America, Inc. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1541 (9th Cir. 1989) (*en banc*) for the proposition that a conspiracy to violate civil rights can be established by evidence of "a close working relationship with the participants, reliance on information and instruction from a participant in furtherance of the conspiracy, and differential treatment of the complainant." *Id.* at 1545-46.

In *United Steelworkers*, the plaintiffs there were striking steel workers who brought a §1983 action against their employer, a mining company. *Id.* at 1540. The plaintiffs alleged that their employer conspired with law enforcement to have them arrested and jailed. *Id.* The mining company had an especially close relationship with the town's law enforcement officials, was the main employer of the small town, and had regular meetings and close radio communication with law enforcement. *Id.* There was evidence that the mining company executives advocated for the plaintiffs' arrest, as well as the incarceration of them after their arrest. *Id.* The case does not stand

24

for the broad proposition that private actors may be found to have been involved in a conspiracy

with law enforcement to violate civil rights if the parties have a close working relationship.  The

narrow question before the court was whether the steelworkers had alleged enough evidence that

their employer was in fact a participant in a conspiracy (the existence of which was not in dispute).

*Id.* at 1541.  Because the fact of the conspiracy was undisputed, and there was evidence that the

company had a close relationship, among other evidence of intent, the court concluded that summary

judgment was improper and reversed the finding of the district court.  *Id.*  The court explained

> . . . there is abundant evidence of cooperative involvement between Phelps Dodge and law enforcement agencies.  The question is, is there more?  We believe there is.  Here, the conspiracy is admitted for purposes of this appeal.  This conspiracy is the "smoking gun."  The issue is whether the Steelworkers presented enough evidence for a reasonable jury to decide that Phelps Dodge helped pull the trigger.

*Id.* at 1546.  The court concluded that the employer's conduct went beyond mere cooperation with

law enforcement – the employer specifically asked for the strikers' arrest to "keep them off the

streets" and specifically requested high bail.  *Id.*  The court explained that a reasonable juror could

conclude that this conduct evinced an intent to keep the strikers off of *all* streets (not just the streets

in front of the plant), and was an effort to have them punished for exercising their civil rights.  *Id.*

With respect to the remaining Defendants other than Officer Bittner, the Court concludes that

there is insufficient evidence to sustain a conspiracy claim for the same reasons that there is

insufficient evidence to sustain a direct violation of Plaintiff's civil rights.  Because the Court has

concluded that Plaintiff has met her burden of providing facts to support a §1983 claim against

Defendant Bittner, the Court must look to his conduct in order to assess whether there is sufficient

evidence of a conspiracy with HACCC.  The Court finds this to be a close question, but concludes

that there are genuine issues of fact that preclude summary judgment on these claims against

Defendant Bittner.

As to the Defendants other than Bittner, Plaintiff argues that there was a close working

relationship between Defendants and the HACCC.  This is insufficient.  In the present case, the

existence of the conspiracy to violate Plaintiff's civil rights is disputed.  There is, therefore, no

"smoking gun."  *Id.* at 1546.  As evidence of this "close working relationship," Plaintiff cites to the

evidence discussed above that Ms. Rodriguez and CAT had a close working relationship and

collaborated in terminating vouchers of Section 8 recipients.  Plaintiff cites to Officer Bittner's

deposition testimony during which he stated that he probably met with Ms. Rodriguez on a daily basis during the relevant period.  Plaintiff also argues that Ms. Rodriguez's testimony that she and HACCC assumed the truth of CAT allegations and therefore conducted no further investigation as to the truth or falsity of those matters, provides proof of a conspiracy to violate civil rights.  Plaintiff also relies upon the undisputed fact that Ms. Rodriguez destroyed the juvenile reports used to terminate Plaintiff's Section 8 voucher, thereby depriving Plaintiff of any opportunity to prepare for her hearing.  JSUF #26.  Finally, Plaintiff points to the Antioch Police Department's refusal to release the relevant police reports to Plaintiff or her attorney in time for the Section 8 hearing.  Plaintiff argues that this conduct by HACCC, Ms. Rodriguez, and Antioch Police Department constitutes sufficient evidence of a conspiracy to violate civil rights under Section 1985.  The Court is not persuaded by Plaintiff's argument that this conduct and the existence of a close working relationship is sufficient, in and of itself, to establish a conspiracy to violate civil rights against Defendants other than Bittner.

However, the Court finds that a reasonable juror could conclude, based upon the evidence before the Court discussed above with respect to the underlying §1983 violations, that a conspiracy to violate civil rights existed under 42 U.S.C. §1985(3) between Officer Bittner and HACCC.  Although the evidence is weak, drawing all inferences in Plaintiff's favor, as this Court must do on summary judgment, a reasonable juror could conclude based on the close working relationship with Officer Bittner and HACCC, the evidence of disparate impact on African-Americans, and the evidence of racial animus on the part of Officer Bittner, that Officer Bittner and HACCC conspired to discriminate against Plaintiff on the basis of race resulting in the loss of her Section 8 voucher and her housing.  For the same reasons the Court concludes that Plaintiff's §1985(3) claim may proceed, the §1986 may also proceed with respect to Defendant Bittner.  Defendants' motion for summary adjudication on these claims is DENIED as to Defendant Bittner.  The remaining Defendants' motion for summary adjudication on these claims is GRANTED.

### 4. Violation of the Fair Housing Act, 42 U.S.C. §§ 3604(b), 3617 (Claim 6)

The Fair Housing Act, 42 U.S.C. §3604(b) prohibits discrimination on the basis of race in the terms, conditions, privileges in the rental of a dwelling or in the provision of related services or facilities.  The Act applies to municipalities.  *Keith v. Volpe*, 858 F.2d 467, 482 (9th Cir. 1988), *cert.*

1   *denied*, 493 U.S. 813 (1989).  In addition, 42 U.S.C. §3617 makes it unlawful to "coerce, intimidate,

2   threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having

3   exercised or enjoyed, or on account of his having aided or encouraged any other person in the

4   exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this

5   title."  The Fair Housing Act is "broad and inclusive" in protecting against conduct that interferes

6   with housing rights and is to be given "generous construction."  *Trafficante v. Metropolitan Life Ins.*

7   *Co.*, 409 U.S. 205, 209 (1972).  Section 3617 deals with, among others, "situations in which the

8   fundamental inequity of a discriminatory housing practice is compounded by coercion, intimidation,

9   threat, or interference."  *Smith v. Stechel*, 510 F.2d 1162, 1164 (9th Cir. 1975).

10      With respect to the first aspect of Plaintiff's FHA claim under §3604(b) the Court concludes

11  that there is insufficient evidence to proceed against the Defendants in this case, the City of Antioch,

12  Antioch Police Department and individual APD Officer Defendants, other than Officer Bittner,

13  under a "disparate treatment" theory.[11]  The claim of disparate treatment or "intentional

14  discrimination" fails under the burden shifting analysis that is applied in these cases.  *See Gamble v.*

15  *City of Escondido*, 104 F.3d 300 (9th Cir. 1997) (applying Title VII discrimination analysis in

16  examining Fair Housing Act discrimination claims; plaintiff can establish FHA discrimination claim

17  under a theory of disparate treatment or disparate impact).  Plaintiff presents little evidence of

18  disparate treatment or intentional discrimination, other than one allegedly racist remark made to a

19  plaintiff in another case by Defendant Bittner.  Plaintiff has presented no evidence of intentional

20  discrimination with respect to the remaining Defendants.  Defendants respond with legitimate

21  nondiscriminatory reasons for their decision to open an investigation of Plaintiff – *i.e.*, that Plaintiff

22  was allegedly in violation of the "Family Obligations" that are required in order to maintain Section

23  8 vouchers.  Defendants have satisfied their burden of coming forward with evidence of a

24  nondiscriminatory reason for their conduct.  It is then Plaintiff's burden to provide sufficient

25  evidence to satisfy the third prong of the analysis – proving by a preponderance of the evidence that

26  the Defendants' proffered nondiscriminatory reason was mere pretext for racial discrimination.

27  _____

28      [11]This claim fails for another reason as well.  Plaintiff has provided no evidence to the Court that
*these* Defendants were in any position to rent housing to Plaintiff or to set the terms and conditions of
rental housing.  Plaintiff's suggestion that the City of Antioch created the "Community Action Team"
for discriminatory reasons or in order to reduce the number of African-Americans living in Section 8
housing in Antioch is not supported by admissible evidence.

*Gamble,* 104 F.3d at 305. Plaintiff has failed to do so here. Plaintiff has proffered no evidence that would suggest that the City of Antioch or the Police Officer Defendants opened an investigation as mere pretext for discriminating against African-Americans, with the exception of Defendant Bittner. Because there is some, albeit weak, evidence of racial animus in the record with respect to Defendant Bittner, and he was involved in the decision to refer Plaintiff to HACCC for Section 8 voucher termination proceedings, this claim could proceed against Defendant Bittner under a "disparate treatment" theory of liability.

Disparate treatment is not the only means by which a Plaintiff may proceed with a claim under the FHA, however. In addition to providing evidence of intentional discrimination, a plaintiff may establish a violation of the FHA by presenting evidence of disparate impact. Unlike the standards discussed above that are applied in an Equal Protection analysis, in order to establish a *prima facie* case of housing discrimination in a disparate impact case, Plaintiff is not required to produce evidence of discriminatory intent. To establish a prima facie disparate impact case under the FHA, a plaintiff must establish that "the defendant's actions had a discriminatory effect." *Pfaff v. U.S. Dep't. of Housing and Urban Development*, 88 F.3d 739, 745 (9th Cir. 1996) (*quoting Keith v. Volpe*, 858 F.2d 467, 482 (9th Cir. 1988), *cert. denied*, 493 U.S. 813 (1989). In *Pfaff*, the Ninth Circuit, by analogy to an age discrimination case, established the following elements of a *prima facie* case under a disparate impact theory under the FHA: "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *Id.* (internal quotations and citations omitted). Proof of discriminatory intent is not required under a discriminatory impact theory. *Id.* at 745-46. Plaintiff must prove, however, "the discriminatory impact at issue; raising an inference of discriminatory impact is insufficient.'" *Id.* at 746 (quoting *Palmer v. United States,* 794 F.2d 534, 538-39 (9th Cir. 1986).

Here, Plaintiff has produced some, albeit weak, evidence of discriminatory impact on a protected class – African-Americans. Plaintiff has also produced evidence that APD threatened Plaintiff's landlord with legal action, and was actively involved in seeking the termination of Plaintiff's Section 8 voucher. Defendants make the same arguments in support of their motion for summary adjudication of this claim as they have raised in support of their motion for summary

adjudication of the §1983 claims – that there is no evidence whatsoever of discrimination based upon race. Defendants argue that they merely investigated Plaintiff and her family due to Section 8 "Family Obligations" violations and that it was HACCC's decision alone to terminate Plaintiff and her family from the Section 8 program. Because a prima facie case in a Fair Housing Act claim, unlike a §1983 claim, does not require proof of discriminatory intent, Plaintiff has made her required showing of providing some evidence of disparate impact – assuming that these Defendants are the proper Defendants for a §3604 claim.

Nonetheless, the Court is not convinced that these Defendants are the proper Defendants for this claim. This question of whether a §3604(b) claim may proceed against individual police officer defendants who are not alleged to have been in the business of providing housing, or alleged to have had the authority to make housing unavailable to Plaintiff – is not addressed by the parties in their briefs. Plaintiff provides no evidence, nor does she allege, that the individual Defendants in this case were in any position of authority to grant or remove her housing (as was the case with the HACCC Defendants, for example). *See e.g.*, *Meadowbriar Home for Children Inc. v. Gunn*, 81 F.3d 521, 531 (5th Cir. 1996) ("It is axiomatic that for an official to make a dwelling unavailable, that official must first have the authority and power to do so. In other words, the official must be in a position to directly effectuate the alleged discrimination."); *Jones v. Office of the Comptroller of the Currency*, 983 F.Supp.197, 202 (D.C. Cir. 1997) (reviewing case law under §3604 and noting that "In all of these cases, however, the entity sued for alleged discrimination was an actor directly involved in providing housing or providing services . . . that are directly connected to helping people acquire housing."). Accordingly, without further guidance from the parties on this issue and in the absence of any controlling authority, the Court is persuaded by the plain language of the statute and the authorities cited above, which suggest that in order to be liable under §3604(b), these Defendants must have at least been in a position of authority as it relates to the rental or sale of housing. Plaintiff has produced no evidence that Defendants provided housing or housing-related services, nor has she provided evidence that Defendants had the authority to make housing unavailable to her or anyone else. Accordingly, Defendants' motion for summary adjudication as to any claim premised on §3604 is GRANTED as to all Defendants, including Officer Bittner.

29

Finally, Plaintiff also includes in her sixth cause of action, a claim based upon §3617, a so-called "retaliation claim" under the Fair Housing Act. This provision makes it a civil offense for individuals to intimidate others who are exercising the rights guaranteed under the Fair Housing Act ("FHA"). 42 U.S.C. § 3617. This provision of the Fair Housing Act is not directed toward only defendants who were in a position to rent or sell property. Plaintiff, however, cites no case authority in support of her argument that this provision may be applied to the alleged conduct of Defendants here. While Plaintiff is not explicit in her brief, her argument appears to be the following: Defendants, by initiating proceedings against her and sending a threatening letter to her landlord, threatened or interfered with her exercise or enjoyment of rights granted or protected by the FHA. Defendants reiterate their argument that none of the Defendants' conduct was discriminatory in any way. Unlike a disparate impact claim under the FHA (discussed above), in order to state a claim for retaliation or interference with protected FHA rights, a Plaintiff must provide evidence of intent to discriminate. *See e.g., Sofarelli v. Pinellas County*, 931 F.2d 718, 722 (11th Cir. 1991) (violations of §3617 must be based, at least in part, on an intent to discriminate). Because the Court has concluded that Plaintiff fails to meet this burden with respect to all Defendants other than Defendant Bittner, the Court GRANTS summary adjudication on this claim with respect to all Defendants, with the exception of Officer Bittner.[12]

For the reasons stated above with respect to the §1983 claim based upon Equal Protection, the Court DENIES Defendant Bittner's motion with respect to the Fair Housing Act retaliation claim

---

[12]The Court notes that it is questionable whether this claim applies to the conduct at issue here – a letter to a housing authority initiating investigative proceedings regarding alleged housing violations. There is a dearth of case law under §3617, but the Court could find no case addressing the factual situation that is presented here – municipal defendants whose conduct consisted of initiating proceedings for potential violations of housing regulations. Most of the cases under §3617 address retaliation based upon a plaintiff's exercise of rights under the FHA or the assistance of others seeking to pursue their housing rights under the FHA. The few cases that address the question of whether a claim may be brought by plaintiffs who claim that their enjoyment of their home was disrupted by defendants' retaliatory or interfering conduct are unclear regarding the level of intimidation, coercion or interference that is required in order to maintain a claim under § 3617. *See Egan v. Schmock*, 93 F.Supp.2d 1090, 1093 (N.D. Cal. 2000) (allowing §3617 claim to proceed in case not involving the sale or rental of housing; claim may proceed on the basis of neighbor defendants' discriminatory conduct designed to drive plaintiffs out of their home); *People Helpers, Inc. v. City of Richmond*, 789 F.Supp.725 (E.D. Va. 1992) (finding that conduct which did not include violence or physical coercion could, nonetheless, violate § 3617). Drawing all inferences in Plaintiff's favor, it is arguable that at least with respect to Officer Bittner, the intent of his conduct, if motivated by racial animus "was to drive [Plaintiff] out of [her] home." *Egan* at 1093.

under § 3617.  The motion is GRANTED with respect to the remaining Defendants as to both the §3617 and §3604 Fair Housing Act claims.

### 5. Violation of 42 U.S.C. § 2000d (Title VI of the Civil Rights Act of 1964) (Claim 5)

Plaintiff's fifth cause of action asserts a violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, which provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  In *Alexander v. Sandoval*, 532 U.S. 275 (2001), the Supreme Court held that private parties may not invoke Title VI regulations to obtain redress for discrimination based upon disparate impact because Title VI itself prohibits only intentional discrimination. The entity involved must be engaged in intentional discrimination and be the recipient of federal funding.  *Rodriguez v. California Highway Patrol*, 89 F.Supp.2d 1131, 1139 (N.D.Cal.2000).  A Title VI claim cannot be asserted against an individual defendant because the individual is not the recipient of the federal funding.  *Folkes v. New York College of Osteopathic Medicine of New York*, 214 F.Supp.2d 273, 292 (E.D.N.Y.2002).

Here, Plaintiff asserts this claim against the City of Antioch and the Antioch Police Department, not against the individual officer Defendants.  Because the Court has concluded that Plaintiff has failed to provide evidence of discriminatory intent on the part of the municipal Defendants, the only potential basis for liability against these Defendants would be based upon an agency theory.  This, Plaintiff cannot do.  Liability under Title VI, which parallels that of Title IX, cannot be imputed to institutions based on the actions of their employees.  *Cf. Gebser v. Lago Vista Independent Sch. Dist.*, 524 U.S. 274, 287-88 (1998) (school district cannot be held liable for harassment of student by teacher based on principles of constructive notice or vicarious liability under Title IX.)

Accordingly, for the same reasons discussed previously, the Court concludes that Plaintiff has failed to provide sufficient evidence of discriminatory intent on behalf of all Defendants, with the exception of Officer Bittner.  Plaintiff's fifth claim, however, is not asserted against Officer Bittner.  And the municipal Defendants cannot be held liable on a *respondeat superior* theory of

liability for the alleged conduct of Officer Bittner under §2000d.  Summary Judgment is therefore

GRANTED on the fifth claim as to all Defendants.

### D.     Municipal Liability for § 1983 Claims (Claim 2)

Plaintiff asserts her §1983 claims against the City of Antioch, Antioch Police Department

and Defendant Hyde on the grounds that the City, through its police department, created the CAT

(Community Action Team), "which emphasized investigation of Section 8 Households, including

Section 8 program participants' compliance with Section 8 program requirements."  SAC at ¶ 55.

Plaintiff alleges that the creation and implementation of this team violated Plaintiff's constitutional

rights by effectively seeking out Section 8 participants, and conducting unlawful searches of their

homes, as well as threatening Plaintiff's landlord in an effort to have her evicted and causing the

HACCC to terminate her Section 8 benefits, all on the basis of her race.  As explained above,

Plaintiff argues that the Defendants' unlawful policies and practices result in a disproportionate

impact upon the African-American community, in violation of the Equal Protection Clause.  Plaintiff

argues that the Defendants Bias, Bittner, Dillard and Schwitters believed that their actions would not

be monitored, investigated, or result in disciplinary action by their supervisors and would instead be

condoned.  Plaintiff argues that the actions of these officers can therefore be attributable to the City

of Antioch under *Monell v. Dep't of Social Services of the City of New York*, 436 U.S. 658 (1978).

The Court finds that Plaintiff's §1983 claim must fail because Plaintiff has failed to present

evidence that could support a finding of a custom, practice or policy of the city of Antioch that has

caused a violation of Plaintiff's constitutional rights.  *Monell*, 436 U.S. at 694.  Rather, Plaintiff has

presented sufficient evidence to proceed under §1983 against one individual police officer

Defendant, Officer Bittner.

In *Monell,* the Supreme Court set forth a two-part analysis regarding when municipal liability

under §1983 can be established.  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986).  The first

part of *Monell* involves the Supreme Court's holding that actions may be brought against

municipalities under 42 U.S.C. § 1983 for deprivations of federal rights.  *Id.*  The second part of the

opinion recognizes a limitation on this right and holds that municipalities cannot be liable under §

1983 under a *respondeat superior* theory.  *Id.*  In that part of the opinion, the Supreme Court

established the "official policy" requirement – that "municipal liability is limited to actions for

32

1    which the municipality is actually responsible." *Id.* at 479.  In *Pembaur v. City of Cincinnati,* the

2    Supreme Court held that:

3        a municipality may be liable under § 1983 for a single decision by its properly constituted
         legislative body – whether or not that body had taken similar action in the past or intended to
4        do so in the future – because even a single decision by such a body unquestionably
         constitutes an act of official government policy.

5

6    *Id*. at 480 (citations omitted).

7        Under *Monell*, a municipality cannot be held liable for constitutional injuries inflicted by its

8    employees on a theory of *respondeat superior.  Monell*, 436 U.S. at 691.  "Instead, it is when

9    execution of a government's policy or custom, whether made by its lawmakers or by those whose

10   edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as

11   an entity is responsible under  1983."  *Id.* at 694.

12       A plaintiff seeking to establish municipal liability under section 1983 may do so in one of

13   three ways:  1) the plaintiff may demonstrate that a municipal employee committed the alleged

14   constitutional violation "pursuant to a formal governmental policy or longstanding practice or

15   custom which constitutes the standard operating procedure of the local governmental entity;" 2) the

16   plaintiff may demonstrate that the individual who committed the constitutional violation was an

17   official with "final policy-making authority and that the challenged action itself thus constituted an

18   act of official government policy;" or 3) the plaintiff may demonstrate that "an official with final

19   policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for

20   it."  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

21       The creation of the CAT team and the policies governing its conduct are not sufficient to

22   give rise to municipal liability under *Monell* because they do not establish an unconstitutional

23   policy.  Nor does the single incident of allegedly racist conduct on the part of Officer Bittner provide

24   sufficient evidence to impose municipal liability here.  As the Supreme Court stated:

25   As the Supreme Court stated:

26       Proof of a single incident of unconstitutional activity is not sufficient to impose liability
         under *Monell*, unless proof of the incident includes proof that it was caused by an existing,
27       unconstitutional municipal policy, which policy can be attributed to a municipal
         policymaker. Otherwise, the existence of the unconstitutional policy, and its origin, must be
28       separately proved. But where the policy relied upon is not itself unconstitutional,
         considerably more proof than the single incident will be necessary in every case to establish
         both the requisite fault on the part of the municipality, and the causal connection between the
         "policy" and the constitutional deprivation.

*City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985).  Absent a formal government policy

that is unconstitutional, Plaintiff here must demonstrate the existence of a "longstanding practice or

custom" of discrimination against African-American Section 8 housing residents.  *Trevino*, 99 F.3d

at 918.  As the Ninth Circuit explained in *Trevino*,

> The custom must be so persistent and widespread that it constitutes a permanent and
> well-settled city policy. . . . Liability for improper custom may not be predicated on
> isolated or sporadic incidents; it must be founded upon practices of sufficient
> duration, frequency and consistency that the conduct has become a traditional method
> of carrying out policy.

*Id.*  In *Trevino*, the Ninth Circuit affirmed summary judgment in favor of the defendant municipality

where the plaintiff alleged that the city council had a custom of paying officers' punitive damages in

excessive force cases.  *Id.* at 916.  The court found that the evidence fell "far short" of establishing a

widespread custom, for the purposes of *Monell*, where the city council had paid officers' punitive

damages in eleven or twelve cases while the action was pending but in no cases up to the date on

which the excessive force was allegedly used.  *Id.*

Here, Plaintiff has failed to provide evidence that Officer Bittner committed the alleged

violations of Plaintiff's  constitutional rights pursuant to a "longstanding practice or custom which

constitutes the standard operating procedure" of the Antioch Police Department's CAT team.

*Monell, supra*.  The evidence discussed above regarding the creation of CAT, CAT's close

relationship with HACCC, as discussed previously, are facially neutral as they target all Section 8

housing recipients, regardless of race.  One incident involving allegedly racist conduct on the part of

one CAT officer (Defendant Bittner) provides insufficient evidence for a jury to consider whether

the City of Antioch, through Officer Bittner, had a widespread custom involving the investigation of

African-American Section 8 tenants such that the conduct "had become a traditional method of

carrying out policy."  *Trevino*, supra, at 918.

Defendants' motion for summary judgment with respect to Plaintiff's second claim under

*Monell, supra*, is GRANTED as to all Defendants.

**D.      Plaintiff's State law claims (Claim 10-17)**

Plaintiff's tenth through seventeenth claims allege various violations of state law.  The

claims are as follows:  "Breach of mandatory duty" (Claim 10), "*respondeat* superior" (Claim 11);

intentional infliction of emotional distress (Claim 12); negligence  (Claim 13); abuse of process

(claim 14); malicious prosecution (Claim 15); housing discrimination (claim 16), and race discrimination (claim 17). Defendants argue that there can be no liability under any state theory because the Defendants are immune from liability by several state law immunities. The Court will address each of Plaintiff's state law claims and whether the individual Defendants are shielded by state immunities.

### 1. Breach of Mandatory Duties Cal. Gov't. Code §815.6 (Claim 10)

California Government Code §815.6 provides as follows: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk fo a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty." Plaintiff's tenth claim under this statute is based upon the allegation that Defendants breached various duties owed to her under several enactments, including 42 U.S.C. §1983, California Constitution, article I, section 1 (right to privacy), the Fourth Amendment to the United States Constitution, and the Federal Fair Housing Act, 42 U.S.C. §§3604, 3617. Liability may be imposed on a public entity pursuant to section 815.6 if three factors are met: "'(1) an enactment must impose a mandatory, not discretionary, duty; (2) the enactment must intend to protect against the kind of risk of injury suffered ...; and (3) breach of the mandatory duty must be a proximate cause of the injury suffered." ' *MacDonald v. California*, 230 Cal.App.3d 319, 327 (1991) (quoting *California v. Superior Court*, 150 Cal.App.3d 848, 854 (1984)). For purposes of section 815.6, an enactment includes a constitutional provision, statute, ordinance, or regulation. *See* Cal. Gov't Code § 810.6. A regulation is defined as "a rule, regulation, order or standard, having the force of law, adopted by an employee or agency of the United States pursuant to the federal Administrative Procedures Act." Cal. Gov't Code § 811.6. "A mandatory duty must impose an affirmative duty to take action or carry out measures." *Bowden v. Redwood Institute for Designed Education, Inc.*, 1999 WL 138889. *6 (N.D. Cal. March 9, 1999)(citing *Clausing v. San Francisco Unified School Dist*., 221 Cal.App.3d 1224, 1240 (1990)). The assertion of a right or prohibition "without specific rules and guidelines for implementation of that right or prohibition cannot create a mandatory duty." *See id.*

The Court will address each of Plaintiff's theories of liability contained in Claim 10.

First, Plaintiff cites to the Fourteenth Amendment to the U.S. Constitution and Article I, Section 7 of the California Constitution – rights to due process and equal protection of the laws. Those claims are addressed above. *See supra* 12-23. In short, of these federal claims, Plaintiff can only continue with her equal protection challenge against Defendant Bittner. The §815.6 claim against all Defendants except Bittner for violations of these constitutional provisions is therefore dismissed. Plaintiff has cited no case in support of the proposition that an individual may be liable under §815.6, which explicitly covers entity, not individual, liability. *See Bradford v. State of California,* 3 Cal.App.3d 16, 19 (1974) ("The California Tort Claims Act of 1963 . . . clearly differentiates between entity liability (Gov. Code, § 820 *et seq*) and employee liability (Gov. Code §815 *et seq*) . . . . Section 815.6 provides a basis of direct entity liability entirely independent of the derivative liability created in Section 815.2"). Defendants' motion with respect to this claim is therefore GRANTED as to Defendant Bittner.

Plaintiff also cites to the "Fourth Amendment to the United States Constitution and Article I, Section I of the California Constitution – right to privacy." SAC ¶83(b). Plaintiff offers no evidence in support of a claim based upon the Fourth Amendment. Summary adjudication on that claim is therefore GRANTED as to all Defendants. As to the right to privacy claim based upon the California Constitution, the Court concludes that this provision is a declaration of the right to privacy; it does not create a mandatory duty under California government Code section 815.6. *See Clausing, supra* at 1240 ("Although citizens have a private cause of action against public entities for violation of the right to privacy, no case has ever held that California Constitution, article I, section 1, imposes a *mandatory duty* on public entities to protect a citizen's right to privacy.") (italics in original). Moreover, the Court finds that Defendants are shielded from liability by the litigation privilege, §47(b). *See infra* (citing *Jacob B. v. County of Shasta*, 40 Cal.4th 989, 955 (2007).

Plaintiff also repeats her federal claims under the Fair Housing Act, 42 U.S.C. §3604 and 3617. Those claims are addressed above. *See supra* at 26-29. Again, in short, Plaintiff can only proceed with her §3617 claim against Bittner, assuming this claim is properly contained in a breach of mandatory duties claim under state law. However, Plaintiff has cited no case in support of the proposition that an individual defendant may be held liable under section 815.6, which, by its terms,

explicitly refers to *entity* liability. The motion for summary adjudication with respect to this claim is therefore GRANTED as to all Defendants.

With respect to Plaintiff's claims based upon violations of state law due to the release of the confidential juvenile records to the Housing Authority, Plaintiff has agreed to dismiss those claims. *See supra* at 1 (citing Plaintiff's Opp. at n.1, n. 19). Finally, Plaintiff lists claims in her tenth cause of action that are based upon "the right to be free from discrimination on the basis of race, color or ethnic group identification in any program or activity that receives benefits from state financial assistance." SAC ¶ 84(f) and (g). Plaintiff has cited no evidence to support those claims. Furthermore, it is doubtful that this claim creates "an affirmative duty on the part of a government agency to perform some act" such that it could constitute a mandatory duty under §815.6. *Clausing*, 221 Cal.App.3d at 1239. Defendants' motion for summary adjudication on these claims is therefore GRANTED.

### 2. *Repondeat Superior* **liability (Claim 11)**

With respect to Plaintiff's eleventh claim for relief, "*respondeat superior* liability" under Government Code § 815.2 against the City of Antioch and the Antioch Police Department, it is not entirely clear what conduct forms the basis of this claim. The Court assumes that it relates to all of Plaintiff's state law claims 10-17, including the alleged breaches of mandatory duties alleged in Claim 10. Unlike the rule against municipal liability under federal law set out *Monell*, *supra,* California imposes liability on municipalities under the doctrine of *respondeat superior*. *Robinson v. Solano County*, 278 F.3d 1007, 1016 (9th Cir. 2002). Section 815.2(a) provides that a city is liable for acts and omissions of its employees under the doctrine of *respondeat superior* to the same extent as a private employer. Under California law, a city's immunity depends upon whether the officers are immune. Cal. Gov.Code § 815.2(b).

Defendants argue that even if there was a disputed material fact that Plaintiff's rights under California law were violated, the motion for summary judgment/adjudication should be granted because the Defendants are shielded by several state law immunities. *See* Defendants' Memorandum of Points and Authorities in Support of Motion for Summary Judgment/Summary Adjudication ("Defendant's Memorandum") at 21.

The Court will next address whether state immunities shield Defendants from liability. The Court finds that three of the five grounds for immunity cited by Defendants do apply to the conduct at issue in this case. Specifically, the Court finds that the individual Antioch Police Officers are immune under the litigation privilege of Cal. Civ. Code § 47(b) and Cal. Gov. Code § 821.6, and therefore, the City of Antioch is immune from liability pursuant to Cal. Gov. Code § 815.2(b). The Court will address each of the applicable state immunities in turn.

> a. *Defendant Antioch Police Officers are immune from liability pursuant to the litigation privilege of Cal. Civ. Code § 47(b)*

According to California Civil Code section 47(b), a privileged publication or broadcast made . . . "in any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable pursuant to [certain provisions of California law]." Cal. Civ. Code § 47(b). Defendants argue that APD officers are immune from liability on the grounds that the disclosures of juvenile information at issue fit under the litigation privilege of section 47(b). *See* Defendants' Memorandum at 21. Specifically, the Defendants argue that the disclosures fall within the litigation privilege of section 47(b) because they were made "to further an investigation of a potential violation of a public welfare program within the context of an administrative proceeding." *Id*. Although not argued in their briefs, the Defendants also maintain that the litigation privilege applies to the officer Defendants' conduct in this case, beyond just the disclosure of juvenile records: 1) the letter to HACCC initiating the investigation of Plaintiff and; 2) he release of information to the HACCC for use at the hearing. The Court agrees.

According to the Supreme Court of California, "the [litigation] privilege 'applies to any publication required or permitted by law in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made outside the courtroom and no function of the court or its officers is involved.'" *Jacob B. v. County of Shasta*, 40 Cal.4th 989, 955 (2007) (quoting *Silberg v. Anderson*, 50 Cal.3d 205, 212 (1990)). Section 47 applies to all torts except malicious prosecution and applies to any communication (1) made in a judicial or quasi-judicial proceeding, (2) by litigants or other participants authorized by law, in or out of court, (3) to achieve the objects

of litigation and (4) that has some connection or logical relation to the action. *Silberg v. Anderson*, 50 Cal.3d 205, 212, 266 Cal.Rptr. 638, 786 P.2d 365 (1990).

A central purpose of section 47 is to promote judicial efficiency through encouraging full communication with the courts. *Id.* (citing *Flatley v. Mauro*, 39 Cal.4th 299, 322 (2006)). The California Supreme Court applies the privilege broadly in furtherance of this purpose. *Id.* (citing *Rusheen v. Cohen*, 37 Cal.4th 1048, 1063 (2006)). For example, courts have held that the privilege extends to causes of action based on the constitutional right to privacy, *Jacob B.*, 40 Cal.4th at 955, as well as civil actions based on perjury. *Rusheen*, 37 Cal.4th at 1063. [13]

In *Jacob B.,* the California Supreme Court held that a letter written in connection with a family law proceeding "fit[] squarely" within the litigation privilege because it was made in the context of a judicial proceeding–there, a pending case–and the letter furthered the objectives of the litigation since the information was relevant to a family law visitation dispute. *Jacob B.*, 40 Cal.4th at 956. The court rejected the plaintiff's claim that defendants had violated his California constitutional right to privacy. *Id.* at 952. The court held that "[c]onsistent with our frequent statement that the privilege protects against all tort causes of action, except for malicious prosecution, including those alleging invasion of privacy," the privilege also extends to communications that might be deemed confidential. *Id.* at 952, 957-59.

Like in *Jacob B.*, the Court finds that the letter to HACCC initiating the proceedings and the subsequent disclosures of records were in connection with an administrative proceeding regarding a potential violation of a public welfare program. *See* 40 Cal.4th at 956. The letter to HACCC and subsequent disclosures were made as part of an investigation leading up to a HACCC proceeding or revocation of Plaintiff's Section 8 benefits. In addition, the letter to HACCC and disclosures to HACCC were relevant to the ultimate objectives of those proceedings. Therefore, the Court finds that the litigation privilege is applicable in the instant context, even assuming *arguendo* that the Defendants did violate the confidentiality provisions of the California Welfare and Institutions Code as Plaintiff alleges. *See* SAC at 8; *See* 40 Cal.4th at 952, 957-59. Accordingly, the Court concludes

---

[13] *But see Komarova v. National Credit Acceptance, Inc.* 95 Cal.Rptr.3d 880, 889 (Cal.App. 1 Dist. 2009) (explaining that the privilege does not prevent criminal and State Bar prosecutions under statutes that are "more specific than the litigation privilege and would be significantly or wholly inoperable if [their] enforcement were barred when in conflict with the privilege") (citing *Action Apartment Assn., Inc. v. City of Santa Monica*, 41 Cal.4th 1232, 1246 (2007)).

that the APD officers are immune from liability pursuant to the litigation privilege of section 47(b). The privilege does not, however, apply to Defendants' letter to Plaintiff's property owner, Mr. Almodovar. Viewing the facts in a light most favorable to Plaintiff, that letter threatening compliance was not made in furtherance of the administrative proceedings. However, there is no evidence that any damage was caused by the letter to Plaintiff's landlord. Therefore, even without state immunity, there can be no liability as a result of that conduct.

> b.     *Defendant Antioch Police Officers are immune from liability pursuant to Cal. Gov. Code § 821.6*

According to California Government Code section 821.6, "[a] public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause." Cal. Gov. Code. § 821.6. Defendants argue that the officers are immune from liability pursuant to section § 821.6. The Court agrees. "California courts construe section 821.6 broadly in furtherance of its purpose to protect public employees in the performance of their prosecutorial duties from the threat of harassment through civil suits." *Gillan v. City of San Marino*, 147 Cal.App.4th 1033, 1048 (citing *Ingram v. Flippo*, 74 Cal.App.4th 1280, 1293 (1999)). Courts have explained that the statute is designed to protect public employees from malicious prosecution actions – *i.e.*, to provide immunity where a public employee "initiates or procures an arrest and prosecution under *lawful process* but with malicious motive and without probable cause." *Id.* at 1043 (emphasis in original). Moreover, the statute not only immunizes the formal acts of filing or prosecuting a judicial or administrative action, but also extends to actions taken in preparation of such formal proceeding. *Id.* at 1048.

In *Gillian*, the plaintiff brought a civil action against the city and police officers, alleging violation of various civil rights statutes, defamation, and intentional infliction of emotional distress in connection with the plaintiff's arrest for alleged sexual molestation of a minor. 147 Cal.App.4th 1033 (1999). In that case, a jury had previously determined that the plaintiff's arrest had been without probable cause. *Id.* at 1041, 1050. On appeal, the court held that pursuant to section 821.6, the court need not even address the issue of whether the defendants acted properly under Penal Code section 849, subdivision (b)(1): "regardless of whether they acted properly under the statute, the defendants are immune from liability made in connection with the investigation." *Id.* at 1050.

From the evidence before the Court, the letter initiating proceedings against Plaintiff and the subsequent disclosures to HACCC were made pursuant to the preparation of a formal HACCC proceeding regarding the termination of Plaintiff's Section 8 benefits and therefore qualifies as "instituting or prosecuting any judicial or administrative proceeding within the scope of . . . [public] employment." *See* Cal. Gov. Code. § 821.6.

Defendants were authorized to engage in an investigation of Section 8 Housing voucher program participants. Section 8 voucher program participants must abide by a list of "Family Obligations," including that "members of the family may not engage in drug-related criminal activity, or violent criminal activity, or other criminal activity that threatens the heath, safety or right to peaceful enjoyment of other residents and persons residing in the immediate vicinity of the premises." JSUF # 6; *see also* CFR 24 § 982.551(1) (crime by household members).

First, in regard to the disclosures made to the HACCC – the agency which conducts the administration proceedings for violation of "Family Obligations" – the Court finds that the disclosures can be properly characterized as an attempt to enforce the relevant statutory obligations – one of the officers' duties. *See* Defendants' Memorandum at 22.

With regard to the letter to the landlord, Defendants allege that he was informed in hopes of "work[ing] with" him to "gain immediate compliance regarding the listed issues and avoid criminal abatement and civil litigation." JSUF #30. The officers told the landlord that he would not be considered an "innocent owner" in future actions if he failed to take "reasonable steps to prevent 'any future unlawful use' of his property.'" Defendants' Memorandum at 5; JSUF #31. Although it is arguable that this letter was written by Defendants in an effort to gain compliance with the "Family Obligations," the Court must view the evidence in a light most favorable to the Plaintiff. Defendants have not argued, nor is there evidence in the record to support the position that the landlord was in a position to initiate HACCC proceedings. There is no evidence in the record that the landlord was involved in conducting the administrative proceedings at all. Therefore communications that precede any administrative hearing and are directed to a party not involved in those proceedings would not seem to be covered by the litigation privilege. Defendants cite to no authority, and the Court has found none, that supports the proposition that the litigation privilege is so broad as to cover such communications.

41

The court finds that the letter to HACCC initiating proceedings and disclosures to HACCC are covered under section 821.6, as they were clearly part of a HACCC proceeding. As in *Gillan,* regardless of whether the officers acted properly under the statutes referenced by Plaintiffs, they are immune from liability because the disclosures were made in connection with preparation for a formal HACCC proceeding. *See* 147 Cal.App.4th at 1050. As the provision applies even where the public employee is acting maliciously and without probable cause, Defendants are immune under section 821.6 as to the limited conduct at issue here – a letter to the HACCC and subsequent disclosures at the administrative hearing – even assuming *arguendo* that Plaintiff's contention is correct, that the Antioch Police Department does "unfairly and unlawfully target[], profil[e] and discriminat[e] against households participating in the Section 8 Housing Choice Voucher Program, and African-Americans who live in the City of Antioch." *See* SAC, ¶ 38.[14]

        *c.*     *Whether state tort liability can attach for bringing a potential violation of welfare program benefits to the attention of local authorities*

Defendants argue that the APD offices are immune from liability because no state tort liability attaches for brining a potential violation of welfare program benefits to the attention of the local authorities. The Court finds it unnecessary to rule on this issue at this time.

The Defendants cite to a Third Circuit decision which held that "[t]here can be no tortuous action or impropriety when private citizens or public officials exercise their rights to notify the appropriate agencies or mobilize public opinion about a serious violation of the law." *Brownsville Golden Age Nursing Home, Inc. v. Wells*, 839 F.2d 155, 159-60 (3d Cir. 1988) (holding that the defendants could not be held tortuously liable for alerting authorities to plaintiff's violations of law, where defendants were attempting to bring a nursing home's noncompliance with the relevant regulations to the attention of the authorities).

However, the Ninth Circuit has held that there is extensive case law on both sides of the question whether the *Noerr-Pennington* doctrine brings first amendment principles to bear on state law tort claims. *In re American Continental Corporation/Lincoln Sav. & Loan Securities Litigation*, 102 F.3d 1524, 1538 and n.15 (9th Cir. 1996), *rev'd on other grounds sub nom Lexecon, Inc. v.*

_____

[14]As stated above, the letter from Defendants to Plaintiff's landlord is not conduct that is covered by 47(b). As Plaintiff conceded at the hearing, the letter to the landlord did not cause damage to Plaintiff. It was the termination of the Section 8 vouchers by HACCC that caused Plaintiff's damage.

*Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998). The Ninth Circuit has ruled that *Noerr-Pennington* principles apply with full force in statutory contexts outside of antitrust, the context in which it was originally created. *Kearney v. Foley & Lardner, LLP*, 566 F.3d 826, 832 (9th Cir. 2009) (citing *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 930 (9th Cir.2006)). However, the Court cannot find a case in which the Ninth Circuit has made its ultimate determination regarding whether the *Noerr-Pennington* doctrine applies in regard to state tort claims. *See In re American Continental Corporation/Lincoln Sav. & Loan Securities Litigation*, 102 F.3d 1524, 1538 n.15 (9th Cir. 1996) (holding that the time has not yet come for the Ninth Circuit to speak on the question).[15] Because the Court finds that the APD officers are immune from liability under the state tort claims pursuant to the litigation privilege of Cal. Civ. Code § 47(b) and to Cal. Gov. Code § 821.6, the Court declines to address this question.

        *d.    APD officers are not immune from liability for their discretionary acts pursuant to Cal. Gov. § 820.2*

The individual Defendant officers assert that they are entitled to immunity pursuant to §820.2 of the California Government Code, which provides that public employees are not liable for injuries caused by a discretionary act. Cal. Gov't Code § 820.2 (West 2006). *See* Defendant's Motion at 23. According to section 820.2, "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." Cal. Gov. Code. § 820.2. Defendants argue that the APD Officers' personal decision to report information about criminal activity of Plaintiff's children to HACCC, the landlord and during the hearing was discretionary and that, therefore, the officers are immune pursuant to section 820.2. The Court disagrees.

The legislature's purpose in enacting section 820.2 was to codify California common law immunity for discretionary acts by public employees within the scope of their employment. *Gillian*, 147 Cal. App. 4th at 1051 (citing *Caldwell v. Montoya*, 10 Cal.4th 972, 980 (1995)). As the courts have clarified, immunity under section 820.2 does not apply to all acts by public employees

---

[15] *But see Sierra Club v. Butz*, 349 F.Supp 934, 939 (N.D. Cal. 1972) (holding that the defendants could not be held liable under state tort law for interfering with an advantageous relationship, where the defendants were attempting to reduce timber sales in an effort to protect the wilderness quality of the land at issue).

according to a literal meaning of the word "discretionary," but rather, is limited to "'basic policy decisions'" that have been expressly committed to coordinate the branches of government and where, therefore, judicial interference would be "'unseemly.'" *Id.* (quoting *Caldwell*, 10 Cal.4th at 981); *see also Johnson v. California*, 69 Cal.2d 782, 794 (1968) (the seminal case in which the California Supreme Court rejected a literal interpretation of the word "discretionary"); *McQuirk v. Donnelley*, 189 F.3d 793 (9th Cir. 1999) (applying the California Supreme Courts' decision in *Johnson* in a determination that the defendant was not immune pursuant to section 820.2). [16]

As the Ninth Circuit has explained, the distinction between a basic policy decision and ministerial conduct "is sometimes characterized as that between the planning and the operational levels of decision making." *McQuirk*, 189 F.3d at 799 (internal quotation marks omitted). As Judge Illston of the Northern District of California further clarified, immunity is limited to "'areas of quasi-legislative policy-making [which] are sufficiently sensitive to call for judicial abstention.'" *Harmston v. City and County of San Francisco*, 2007 WL 2814596, *3 (N.D. Cal. 2007) (Illston, J.) (quoting *Caldwell v. Montoya*, 10 Cal.4th at 981) (internal quotations omitted). Furthermore, "[t]here is no immunity for ministerial decisions that 'merely implement a basic policy already formulated.'" *Id.* (citing *Caldwell,* 10 Cal.4th at 981).

In *Caldwell*, the California Supreme Court held that school board members were immune from liability, pursuant to section 820.2, in relation to the termination of a school superintendent for discriminatory and retaliatory reasons. 10 Cal.4th at 976-77, 989. The court found that the school superintendent was "the district's foremost appointed official," a "central post" that carried with it "fundamental policy implications." *Id.* The court also found it significant that a state statute specifically vested the school board with authority over the superintendent's employment, an indication that the decision was "expressly entrusted to a coordinate branch of government at its

---

[16] The Supreme Court of California has preserved the distinction between policy and operational judgments in various circumstances. *See Lopez v. Southern Cal. Rapid Transit Dist.*, 40 Cal.3d 780, 793-795 (1985) (rejecting claim of immunity for a bus driver's decision not to intervene in one passenger's violent assault against another); *Peterson v. San Francisco Community College Dist.*, 36 Cal.3d 799, 815 (1984) (rejecting a claim of immunity for a college district's failure to warn of known crime dangers in a student parking lot); *Sanborn v. Chronicle Pub. Co.,* 18 Cal.3d 406, 415-416 (1976) (rejecting a claim of immunity for a county clerk's libelous statements during a newspaper interview about official matters); *Tarasoff v. Regents of University of California*, 17 Cal.3d 425, 444-447 (1976) (rejecting claim of immunity for a university therapists' failure to warn a patient's homicide victim of the patient's prior threats to kill her).

44

highest level." *McQuirk v. Donnelley*, 189 F.3d 793, 800 (9th Cir. 1999) (citing *Caldwell*, 10 Cal.4th at 982) (internal quotation marks omitted).

On the other hand, in *Gillan*, the court held that the decision to arrest the plaintiff was not a basic policy decision but rather an "operational decision by the police purporting to apply the law." *Id.* Therefore, the court held that the immunity provided under section 820.2 was not applicable and provided no defense to the plaintiff's claim for violation of California Civil Code Section 52.1.

Similarly, the Ninth Circuit held in *McQuirk* that a sheriff's decision as to what to include in a particular reference was merely an implementation of a larger policy, not a basic policy decision in itself. 189 F.3d at 799. The court therefore concluded that the defendant was not immune pursuant to section 820.2, and that the district court had erred in granting summary judgment on that basis. *Id.* at 800.

In *Harmston v. City and County of San Francisco*, Judge Illston held that the court could not find, based on the pleadings before the court, that defendants were immune from liability under section 820.2. 2007 WL 2814596 (N.D. Cal. 2007) (ruling on defendants' motion for judgment on the pleadings, where plaintiffs alleged claims of racial discrimination, retaliation, defamation, and intentional infliction of emotional distress). The court explicitly distinguished the case from *Caldwell*, explaining that "the parties have not pointed to a . . . governing statute [which expressly entrusted decision-making authority to a coordinate branch of government at its highest level], and the plaintiff police officers do not hold the same high-level of authority as the school superintendent in *Caldwell*." *Id.* at *4. The court found that "such a nuanced examination" as to whether the chief of police's decision was a basic policy decision or merely a ministerial decision could not be made on the bare pleadings before the court. *Id.* at *5. The court held, however, that "it may become clear [as the case develops] that [the defendant] was actually involved in making policy . . . due to the nature of the plaintiffs' conduct and its impact on the police department and the community at large." *Id.*

Defendants cite to a 1969 California Supreme Court Decision, *McCorkle v. City of Los Angeles,* 70 Cal.2d 252, 261 (1969). As explained above, since the California Supreme Court ruled on *McCorkle*, both the California Supreme Court and the Ninth Circuit have further clarified that immunity is limited to "'basic policy decisions,'" not just decisions that involve personal

45

deliberation, decision and judgment. *See Caldwell,* 10 Cal.4th at 981; *McQuirk v. Donnelley*, 189 F.3d at 800. *See also Harmston*, 2007 WL 2814596, *3 (Illston, J). Furthermore, the facts of *McCorkle* are not particularly instructive here. In that case, the court held that section 820.2 immunity did not apply to a police officer's negligent conduct of a traffic investigation once undertaken. *McCorkle*, 70 Cal.2d at 261- 262. In addition, the court in *Caldwell* characterized *McCorkle* as an example of a case that *cannot* be characterized as a policy judgment. *Caldwell,* 10 Cal.4th at 982, 981-82.

Defendants argue that the officers' decision to report redacted information about the criminal activity of Plaintiffs' children to HACCC, the landlord, and during the hearing was discretionary. *See* Defendants' Memorandum at 23. They provide no evidence to support a determination that officers engaged in a policy decision. To the contrary, their characterization of the decision as personal and discretionary suggests that it was not a policy decision but rather a situation-specific decision. *See* Defendants' Memorandum at 23. Thus, the Court finds that the present case is more comparable to *Harmston,* where the Judge Illston held that "there is no immunity for ministerial decisions that 'merely implement a basic policy already formulated.'" *See Harmston*, 2007 WL 2814596, *3.[17] In addition, like in *Harmston,* the Court finds it significant that Defendants do not cite to a statute that expressly entrusts them to make the decision to report redacted information about the criminal activity of a Section 8 Housing Unit voucher program participant's children to the HACCC, the participant's landlord, an administrative court, or other authorities – a statute that, if existent, might suggest that the officers' decision was a basic policy decision. Nor does the Plaintiff have a high-level of authority, such as in *Caldwell* where the plaintiff held the important position of superintendent of the school district. *See* 10 Cal.4th at 976-77, 989. Rather, from the record currently before the court, there appears to be nothing to suggest that the decision to present the information at issue to HACCC was a policy-based decision. Therefore, the Court finds that the immunity provided under section 820.2 is not applicable to the conduct of Defendants in this case.

---

[17] Plaintiff contends that the Antioch Police Department "has a reputation for unfairly and unlawfully targeting, profiling and discriminating against households participating in the Section 8 Housing Choice Voucher Program, and African-Americans who live in the City of Antioch." SAC, ¶ 38. Even assuming that this allegation is true, the Court finds that the officers' decision to act upon such a policy would be considered a ministerial decision merely implementing a basic policy already formulated. *See Harmston*, 2007 WL 2814596, *3.

46

e.    *The City of Antioch is immune from liability pursuant to Cal. Gov. Code §*
      *815.2(b)*

California Government Code section 815.2(b) provides that "a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability." Cal. Gov. Code § 815.2(b). Defendants argue that the City of Antioch is immune from liability pursuant to section 815.2(b). Because the Court concludes that Defendants are immune from liability pursuant to both Cal. Civ. Code § 47(b) and Cal. Gov. Code § 821.6, the Court finds that the City of Antioch is also immune. Accordingly, the municipal Defendants are immune from liability for conduct alleged in claims 10, and 12-15. However, they may be liable for the conduct of Bittner under claims 16 and 17.

## 2.    State Tort Claims – Negligence, IIED (Claims 12 and 13)

Plaintiff's negligence claim fails for two reasons. As an initial matter, Plaintiff has failed to put forth any evidence to support this claim, and in particular, what duty was owed to her by the Antioch Police Department Defendants. Second, the Court concludes that state law immunities apply and shield Defendants from liability for this claim.

Without any citation to authority, Plaintiff argues that "Defendants breached their duties to Plaintiff by submitting Plaintiff's case to HACCC for termination without conducting an inquiry as to whether the allegations against Plaintiff's children were supported by a preponderance of the evidence." Pl.'s Opp. at 24. The Court concludes that these claims must fail as to *all* Defendants due to the applicability of state law immunity discussed previously. *See supra*, 33-35 (discussion of 47(b) privilege) and 35-37 (discussion of § 821.6 immunity); *see also Action Apartment Ass'n, Inc. v. City of Santa Monica*, 41 Cal.4th 1232, 1242 (2007) (California courts have applied the litigation privilege liberally to immunize defendants in cases of intentional infliction of emotional distress, invasion of privacy, and negligence).

Similarly, the Court finds that Plaintiff's IIED claim cannot proceed to trial against any of the Defendants. To succeed on a claim of intentional infliction of emotional distress, a plaintiff must demonstrate:

> (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendants' outrageous conduct.

*Christensen v. Superior Court*, 54 Cal.3d 868, 903 (1991). "Outrageous conduct" requires that the conduct must be so extreme "as to exceed all bounds of that usually tolerated in a civilized community." *Id.* California courts have held that the question of whether the conduct alleged in the complaint is sufficiently "extreme and outrageous" is generally a factual issue for the jury. *See Angie M. v. Superior Court*, 37 Cal.App. 4th 1217, 1226 (1995). Plaintiff's claim for intentional infliction of emotional distress is derivative of her claims of violations of her civil rights under federal law against Defendant Bittner. Because there are triable issues of fact regarding these claims, this claim would survive against Bittner, were it not for the applicability of state law immunity. The Court finds both §47(b) and §821.6 applicable here, and Defendants are therefore shielded from liability for these claims.[18] *See e.g., Amylou R. v. County of Riverside*, 28 Cal.App.4th 1205 (1994) (§821.6 immunized police officers from liability for intentional and negligent infliction of emotional distress based on statements made by the officers during their investigation of rape). The motion for summary adjudication with respect to the all Defendants on the negligence and IIED claims is therefore GRANTED.

### 3. Abuse of Process and Malicious Prosecution (Claims 14 and 15)

Defendants argue that the Plaintiff's Abuse of Process and Malicious Prosecution claims should be dismissed because they lack any evidentiary support. Plaintiff merely alleges that the Defendants terminated her housing benefits.

The Court concludes that the state immunities discussed above prevent liability on Plaintiff's Abuse of Process and Malicious Prosecution claims. As to Plaintiff's state Malicious Prosecution claim, the Court finds that Defendants are immune under California Government Code section 821.6, which is discussed above. Section 821.6 provides: "A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause."

---

[18]For the same reasons discussed above, however, the Court concludes that these privileges to not apply to the conduct involving the allegedly threatening letter to the landlord. Plaintiff has conceded at the hearing, however, that there is no damage as a result of that conduct. Plaintiff was not evicted by her landlord.

The California Supreme Court has explained section 821.6's application:

> . . . California law grants immunity to any "public employee" for damages arising from malicious prosecution. (§ 821.6.) "Although Government Code section 821.6 has primarily been applied to immunize prosecuting attorneys and other similar individuals, this section is not restricted to legally trained personnel but applies to all employees of a public entity .... 821.6 "applies to police officers as well as public prosecutors since both are public employees within the meaning of the Government Code."

*Asgari v. City of Los Angeles*, 15 Cal.4th 744, 756-757 (1997) (internal citations omitted); *see also Randle v. City and County of San Francisco*, 186 Cal.App.3d 449, 456 (1986). Because the individual officers are immune from liability for malicious prosecution under §820.6, the municipal Defendants are immune under 815.2(b). Under California law, a municipality is not liable for malicious prosecution arising from its employee's immunized conduct within the scope of the employee's employment. *See Vivell v. City of Belmont*, 274 Cal.App.2d 38, 41 (1969).

With respect to the abuse of process claim, the analysis is the same. The common law tort of abuse of process arises when one uses the court's process for a purpose other than that for which the process was designed. *Rusheen v. Cohen*, 37 Cal.4th 1048 (2006) (citing 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 459, p. 547). The elements of the tort of abuse of process are: (1) defendant contemplated an ulterior motive in using the process, and (2) defendant committed a willful act in the use of the process not proper in the regular conduct of the proceedings. *Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc.*, 42 Cal.3d 1157, 1168 (1986). "Abuse of process claims merely require malice, which 'may be inferred from the wilful abuse of the process.' " *Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund*, 24 Cal.4th 800 (2001) (citing *Tranchina v. Arcinas*, 78 Cal.App.2d 522, 526 (1947)).

Here, Plaintiff alleges that Defendants abused the legal process by "willfully and improperly terminat[ing] Plaintiff's Section 8 housing benefits voucher in violation of federal and state law." SAC at ¶ 99. Plaintiff has proffered no evidence in support of her claim and in opposition to the motion for summary judgment, other than to repeat her arguments made in connection with the other claims, namely, that the officers improperly initiated proceedings by referring her case to HACCC for investigation and termination, provided information to HACCC improperly, and wrote a threatening letter to her landlord. Plaintiff argues that this conduct was done with malice and with racial animosity. As discussed previously, however, malice does not destroy immunity under

§821.6. *See e.g., Garcia v. City of Merced,* 2008 WL 115201, *11 (E.D. Cal. January 10, 2008) (finding immunity under §§821.6 and 815.2 on abuse of process claim). The individual officer Defendants are entitled to immunity under §821.6 for the abuse of process claim. If their employees are immune under § 821.6, then the municipal entity Defendants, City of Antioch and Antioch Police Department, are immune under California Government Code Section 815.2.

The motion for summary adjudication with respect to claims 14 and 15 against all Defendants is therefore GRANTED based upon the immunities set forth in §§821.6 and 815.2.

### 4. Housing and Race Discrimination (Claims 16 & 17)

Defendants' arguments in support of their motion for summary adjudication essentially mirror their arguments with respect to the federal claims – that there was no discrimination. Defendants have not argued, and the Court can find no authority for the proposition that the state law immunities discussed above shield the Defendants from state housing and race discrimination claims. For the reasons stated above, the motion is GRANTED with respect to all Defendants, with the exception of Defendant Bittner. These claims may proceed against Officer Bittner.

### 5. Declaratory and Injunctive Relief (Claim 18)

Defendants' Motion with respect to claim 18 is GRANTED as to the claims dismissed above; and the Motion is DENIED with respect to the claims that may proceed to trial.

### III. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART AND DENIED IN PART as follows:

1) the Motion as to claims one through four, to the extent based upon the unauthorized release of juvenile records, is GRANTED as to all Defendants;

2) the Motion on Plaintiff's equal protection claim under §1983 (claim 1) is GRANTED as to all Defendants with the exception of Officer Bittner. The motion is DENIED with respect to Officer Bittner;

3) the Motion is GRANTED on Plaintiff's procedural due process claims (claim 1) as to all Defendants;

50

4) the Motion is GRANTED on Plaintiffs §§ 1985(3) and 1986 claims (claims 3 and 4) as to all Defendants with the exception of Officer Bittner. The motion is DENIED with respect to Defendant Bittner;

5) the Motion is GRANTED on Plaintiff's §3604 claim (claim 6) as to all Defendants;

6) the Motion is GRANTED on Plaintiff's §3617 claim (claim 6) as to all Defendants, except for Defendant Bittner. The Motion is DENIED with respect to Officer Bittner;

7) the Motion is GRANTED on Plaintiff's claim under 42 U.S.C. § 2000d (Title VI of the Civil Rights Act of 1964) (claim 5) as to all Defendants;

8) the Motion is GRANTED on Plaintiff's *Monell* claim (claim 2) with respect to municipal liability for all Defendants;

9) the Motion is GRANTED as to all Defendants on Plaintiff's claim based upon the breach of mandatory duties (claim 10);

10) the Motion is GRANTED on Plaintiff's respondeat superior claim (claim 11) as to all Defendants except with respect to the allegations against Defendant Bittner in claims 16 and 17;

11) the Motion is GRANTED on Plaintiff's negligence and IIED claims (claims 12 and 13) against all Defendants;

12) the Motion is GRANTED on Plaintiff's state abuse of process and malicious prosecution claims (claims 14 and 15) against all Defendants;

13) the Motion is GRANTED on Plaintiff's housing and race discrimination claims (claims 16 and 17) under state law as to all Defendants other than Officer Bittner. The motion is DENIED with respect to Defendant Bittner;

14) the Motion is GRANTED on Plaintiff's declaratory and injunctive relief claim (claim 18) with respect to the claims that are dismissed herein, and DENIED with respect to the claims that may proceed to trial.

IT IS SO ORDERED.

Dated: October 2, 2009

_____
JOSEPH C. SPERO
United States Magistrate Judge